STATE of Missouri, Respondent,

v.

Faye COPELAND, Appellant.

No. 73774.

Supreme Court of Missouri,
En Banc.

Aug. 20, 1996.

Rehearing Denied Sept. 17, 1996.

**834**

Janet Thompson, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Cheryl A. Caponegro, Christine M. Ble-gen, Assistant Attorneys General, Jefferson City, for respondent.

HOLSTEIN, Chief Justice.

Defendant Faye Copeland was convicted for her complicity in the first degree murders of Paul Cowart, John Freeman, Jimmie Harvey, Dennis Murphy and Wayne Warner. She was sentenced to death for the murders of Cowart, Freeman, Harvey, and Warner. She was sentenced to life imprisonment without possibility of parole for the murder of Murphy. Defendant filed a postconviction motion pursuant to Rule 29.15. Relief was denied after an evidentiary hearing. This Court has jurisdiction of the appeal. *Mo. Const. art. V, § 3.* The judgments are affirmed.

**I.**

The evidence adduced at defendant's trial, viewed in a light most favorable to the verdict, establishes that defendant and her husband, Ray Copeland, were involved in a complex fraudulent check and cattle buying scheme. The plan culminated in the murder of at least five homeless transients who were lured into the plan under the guise of being offered work. The homicides occurred between 1986 and 1989.

Ray would enlist a transient at a homeless shelter and bring him to the couple's rural Mooresville, Missouri, farm home. The plan involved the transient being transported to nearby towns where the homeless person would open a post office box and checking account using the Copelands' money. The transient would then be taken to various livestock auctions where he would buy cattle at Ray's direction. The cattle would be purchased using the transient's newly obtained checks. The checking account did not have funds sufficient to cover the cattle purchases. The cattle would be sold immediately after the purchase. The homeless person would be killed before the checks would bounce and before authorities could investigate. The Copelands went to great lengths to avoid any association with the transient victim. The plot ultimately unraveled following a tip to police by a potential victim, Jack McCormick.

McCormick lived to tell the story of his experience with the Copelands.

McCormick's first contact with the Copelands occurred in July 1989, when Ray Copeland went to the Victory Mission in Springfield, Missouri, offering work. McCormick, a recovering alcoholic, agreed to work for Ray. Ray claimed to be hard of hearing and needed assistance in bidding on cattle at auctions.

Under the directions of the Copelands, McCormick obtained a post office box in the nearby town of Brookfield, Missouri, then opened a checking account at the bank in the same community, using the Copelands' money. Starter checks were obtained. Defendant requested that McCormick sign a blank starter check. Over the next few weeks, McCormick accompanied Ray to various cattle auctions where cattle would be purchased using the starter checks.

On August 6, 1989, while walking behind the barn, McCormick observed what he believed to be a human skull and a leg or an arm bone protruding from the ground. As he returned to the house, he was met by the defendant, who seemed upset and told McCormick that she and Ray did not want anyone going back there.

On the August 8, 1989, the printed checks arrived at the Brookfield bank. After obtaining the checks, Ray took McCormick to an auction sale in Green City, Missouri. After the sale, Ray expressed dissatisfaction with McCormick's cattle buying skills in the presence of defendant. At that point, McCormick decided to terminate his relationship. He asked Ray to take him to Brookfield to close the checking account.

The next morning, defendant made excuses for leaving early, claiming she was going to her part-time work at the Holiday Inn. Ray lured McCormick into the barn under the pretense of helping locate a raccoon. Ray was armed with a .22 caliber rifle. McCormick noticed that a tractor had been backed up near the barn, a two-wheel trailer attached, and on the trailer was a shovel and a piece of plastic. While poking a stick in a hole in the barn floor, McCormick turned and saw Ray with the rifle pointed directly at McCormick.

McCormick persuaded Ray to take him to Brookfield. Ray agreed, but insisted on going first to the courthouse in Chillicothe. Ray and McCormick found defendant waiting at the courthouse. She seemed surprised to see McCormick. Still later that day, defendant followed Ray and McCormick to Brookfield, where the checking account was closed, even though a check for $1,157.46 to the Green City auction barn was still outstanding. McCormick refused to return to the farm for his belongings. That ended McCormick's business relationship with the Copelands.

Later on the same day that McCormick and the Copelands parted company, McCormick went to a bar where he met Rose Clevenger. He told her about the Copelands and his belief he would be harmed if he returned to their farm for his belongings. She agreed to take him to Mooresville to get his belongings from the Copelands. Upon arriving at the farm house, defendant and Ray came out and cursed at McCormick. McCormick introduced Clevenger as his sister, but apparently defendant was not convinced. She insisted that Clevenger supply her real name. Defendant wrote down Clevenger's name and the vehicle license number.

Two weeks and much liquor after leaving the Copeland farm for the final time, McCormick found himself in Nebraska, where he called a local "crime stoppers" hotline and reported that he had seen three or four bodies on the Copeland farm. He was arrested in Oregon for the bad check he wrote at the Green City livestock sale barn and for auto theft.

The Copelands tried essentially the same scheme used on McCormick with Lothar Borner and James Page. In August 1989, Ray enticed Borner from the Souls Harbor Mission in Joplin to come work for him buying cattle. Borner had difficulty obtaining a post office box and a checking account. Concerned that something was afoot, Borner decided to return to Joplin.

The next month, in September of 1989, James Page agreed to buy cattle for Ray. Upon their arrival at the farm, defendant had

supper waiting. Later, Ray and Page tried, unsuccessfully, to get a post office box for Page in Sedalia. Page ultimately obtained one in Gallatin. There he opened a checking account with Ray's money, ordered printed checks and signed a blank starter check over to Ray. Defendant took Page to a sale barn. On the way to the sale barn, they stopped at a restaurant where defendant told Page, "In case anybody asks who I am, just tell them I am your wife."

After Page's printed checks arrived, he signed two blank checks over to the Copelands. Defendant and Ray told him they tore up the starter check. Defendant went with Ray and Page when Page deposited $2,000 of the Copelands' money into the checking account. During all of these events, defendant kept a running tally of this and other of Page's bank transactions, including the dates and amounts of deposits and withdrawals. Throughout this time, Page purchased cattle at sales where defendant was present. Defendant took Page to the bank on occasion. As with McCormick and other victims, cattle were bought and sold before checks could clear. A few days later, Ray was arrested. Page survived.

Acting on McCormick's tip, the police obtained a search warrant for the Copeland farm. The guest bedroom closet was filled with clothing. The clothes in the closet were of different sizes, and some of the clothes in the closet were later identified as belonging to the murder victims. Luggage, later identified as belonging to one of the victims, was also found in the guest room closet.

The police found pieces of notebook paper on which defendant had written McCormick's and Page's personal banking information. Police found defendant's notation of Clevenger's name and license number. Perhaps the most incriminating piece of evidence found during the search was a small piece of paper inside a Polaroid camera case which had a list of names. Three of those named were victims. Next to each name was the notation "back" or "X". Next to the names of each of the three dead men was an "X". The list was in defendant's handwriting. The search of the premises disclosed two pasture rental agreements in defendant's handwriting under

which Ray Copeland rented pasture to two of the victims, Wayne Warner and Dennis Murphy. At minimum, the documentary evidence shows that defendant participated in the financial transactions involving the victims and permits inferences that she was in agreement with Ray to carry out the scheme and had knowledge of the victims' fate.

An inventory of defendant's purse disclosed McCormick's signed blank check and Page's signed blank starter check. Jail personnel discovered numerous notes sent by defendant to Ray suggesting knowledge that something incriminating might turn up from various searches of their property.

Acting on tips from local residents, the police discovered several shallow graves in a barn on a farm near Ludlow, Missouri, where Ray had done odd jobs and where defendant had been seen. On yet another farm, police discovered the body of Wayne Warner buried in a shallow grave beneath thousands of large round bales of hay. At the same farm, police found the body of Dennis Murphy chained to a forty-pound concrete block at the bottom of a well.

Autopsies revealed that all the victims died from gunshot wounds to the head. One of the bullets recovered was positively identified as being fired from a .22 caliber rifle found in the Copelands' home.

Both Freeman and Cowart were found to have opened accounts at local banks and purchased and sold cattle at various sale barns. Each account ultimately had checks written to local sale barns returned for insufficient funds. After Freeman's last check bounced, the bank closed his account and sent him a check for the small amount remaining. The bank sent the check via certified mail to the Copelands' address. Although defendant originally signed for the Freeman letter, she later returned it to the postal carrier and said she did not know who Freeman was. She also went to a bank and indicated that she neither knew Freeman nor how the bank had gotten her address. She told bank personnel not to send any more of Freeman's mail to her home.

## II.

■■ The trial court rejected an offer of proof during the guilt phase of the testimony of psychologist Marilyn Hutchinson that defendant was suffering from the battered spouse syndrome at the time of the murders. The denial of the opportunity to present relevant and competent evidence negating an essential element of the state's case may, in some cases, constitute a denial of due process. *See Simmons v. South Carolina,* 512 U.S. 154, ——, 114 S.Ct. 2187, 2194, 129 L.Ed.2d 133 (1994). However, the due process clause does not require the admission of irrelevant evidence. *Crane v. Kentucky,* 476 U.S. 683, 689–90, 106 S.Ct. 2142, 2146–47, 90 L.Ed.2d 636 (1986). Neither does it require the admission of all relevant evidence. *Montana v. Egelhoff,* —— U.S. ——,——, 116 S.Ct. 2013, 2021, 135 L.Ed.2d 361 (1996). Because expert testimony is always fraught with questions of relevancy and competency, the decision to admit expert conclusions is a matter of trial court discretion that will not be overturned on appeal absent an abuse of discretion. *State v. Davis,* 814 S.W.2d 593, 603 (Mo. banc 1991), *cert. denied,* 502 U.S. 1047, 112 S.Ct. 911, 116 L.Ed.2d 812 (1992).

■ The asserted relevance of Dr. Hutchinson's testimony during the guilt phase is dubious. In suggestions in support of Dr. Hutchinson's testimony, defense counsel stated that defendant did not intend to rely on the defense of mental disease or defect. Under direct questioning by the court, counsel reiterated that defendant did not intend to rely on the defense of mental disease or defect or on the defense of diminishment of responsibility. Defense counsel claimed Dr. Hutchinson's testimony was proposed to be offered on issues "such as Faye Copeland's knowledge of the situation surrounding her, and Faye Copeland's intent, or lack thereof, *to commit criminal conduct.*"

The General Assembly has made specific provision in chapter 552 [1] limiting circumstances when evidence of a mental disease or defect may be admitted in a criminal proceeding. Mental disease or defect is defined to include "congenital and traumatic mental conditions as well as disease." § 552.010.

Evidence that a defendant suffered from a mental disease or defect is "not admissible in a criminal prosecution except as provided in this section." § 552.015.1. That section goes on to permit evidence of a mental disease or defect to determine if the defendant is criminally responsible or to prove the defendant did not have the state of mind which is an element of the offense. § 552.015.2(2) and (8). The legislature has further determined that a defendant is not responsible for his conduct if, as a result of a mental disease or defect, such person was "incapable of knowing and appreciating the nature, quality or wrongfulness of his conduct." § 552.030.1. Finally, evidence of a mental disease or defect excluding responsibility is not admissible in a criminal trial unless the accused, at the time of entering the plea of guilty or later, with permission of the court, gives notice of the intent to rely on such defense. § 552.030.2. The purpose of requiring notice is to give the state the opportunity to conduct its own examination of the accused and avoid unfair surprise by allowing a defendant to raise the issue at the last minute.

■ If the evidence was not being offered as expert testimony diagnosing defendant to have a mental disease or defect excluding responsibility for committing one or more elements of the crime, including absence of the appropriate culpable mental state, it is inadmissible under chapter 552. Except as provided by chapter 552, expert testimony of a defendant's state of mind affecting criminal responsibility is not authorized and may be excluded. *State v. Erwin,* 848 S.W.2d 476, 480 (Mo. banc 1993); *State v. Clay,* 779 S.W.2d 673, 677 (Mo.App.1989).

If the evidence was being offered as expert testimony of a diagnosis of a mental disease or defect that excluded defendant's criminal responsibility, the defendant must comply with the notice requirements of § 552.030. As previously noted, defense counsel made clear that defendant was not intending to rely on the defense of mental disease or defect or on the defense of diminished responsibility due to mental disease or defect. For that reason,

---

1. All statutory references are to RSMo 1994 unless otherwise noted.

the trial court did not abuse discretion in excluding the testimony.

██ Even assuming the evidence had been offered to prove mental disease or defect, Dr. Hutchinson's testimony failed to establish that fact. She testified in the offer of proof that her conclusion was that defendant suffered from the battered spouse syndrome, which expresses itself by obsessive behavior, depression, social isolation, deference to the spouse, confusion, low self-esteem, guilt, lack of independence in thought or action, denial of reality, and a feeling of an absence of control of events around her. However, Dr. Hutchinson did not testify the syndrome was a mental condition, disease or defect that would have prevented defendant from premeditating or possessing any other culpable mental state.[2] Dr. Hutchinson stated that defendant could tell right from wrong, that she presented no psychosis, that she possessed no mental disease or defect as defined by Chapter 552, that she was capable of conforming her conduct to the requirements of the law, and that defendant was competent to stand trial.

Though not argued, another potential basis for introducing Dr. Hutchinson's testimony was to prove that defendant's participation in the homicide was the product of duress or coercion by defendant's husband. At common law, duress and coercion by a husband were not defenses to murder, and duress and coercion are not defenses to murder under our statutes. *State v. Isa*, 850 S.W.2d 876, 899–900 (Mo. banc 1993); § *562.071*.

Our legislature has authorized the defense of battered spouse syndrome in matters of self-defense. § *563.033*. Had the legislature intended battered spouse syndrome to be a general defense, it could easily have made provision for that defense. If self-defense is not in the case, there is no authority for admitting such evidence unless in support of a claim of mental disease or defect. *See*

*State v. Clay*, 779 S.W.2d 673, 677 (Mo.App. 1989).

From the above, it appears that the only issue to which Dr. Hutchinson's testimony would be relevant was whether defendant was responsible for her conduct or had a diminished responsibility for her conduct as a result of a mental disease or defect. Because no notice had been given of an intent to rely on those defenses and the evidence failed to support such conclusion, no violation of due process resulted from the trial court's rejection of the evidence.

### III.

On its own motion, pursuant to § 552.020, the trial court ordered a mental evaluation to determine if defendant was competent and otherwise fit to stand trial. The examination was done by Dr. Richard Jacks, a psychiatrist.

Section 552.020.12 provides,

No statement made by the accused in the course of any examination or treatment pursuant to this section and no information received by any examiner or any other person in the course thereof ... shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding.

During the penalty phase, defendant again called Dr. Hutchinson, who testified that defendant fit the profile of a battered spouse. This evidence was apparently offered in mitigation of punishment. In response to Dr. Hutchinson's testimony, the state called Dr. Jacks. Over defendant's objection, he was allowed to give his opinion that defendant was not a battered woman. Defense counsel objected that this violated defendant's Fifth Amendment right against self-incrimination. Defendant now claims her lawyer was ineffective in failing to timely and properly object.

2. Testimony given during the punishment phase as well as at the post-conviction hearing confirmed that at the time of trial, "battered woman syndrome" had not been recognized as a distinct psychiatric diagnosis found in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (DSM–III and DSM–III–R). The phrase "battered woman syndrome" appears to have been coined by Dr. Lenore Walker, a psychologist, and popularized by Dr. Walker's 1979 book *The Battered Woman* and her subsequent appearances on television talk shows and newscasts. The phrase, as Dr. Walker uses it, refers to the "constellation of symptoms" that are associated with a subcategory of the diagnosis post-traumatic stress disorder.

■ Here defendant's guilt had already been established when Dr. Jacks' testimony was presented. The issue upon which he testified was admitted in response to the testimony of Dr. Hutchinson relating to mitigation of punishment. The statute in question, § 552.020.12, only prohibits admission of the examiner's testimony on the issue of guilt. The statute was not violated.

■ The other asserted basis for excluding the testimony of Dr. Jacks is the prohibition against self-incrimination. In calling Dr. Hutchinson as an expert witness, defendant put her mental condition in issue. Once the defendant put her mental condition in issue, defendant waived any claim that the testimony by Dr. Jacks or other experts who examined her violated her privilege against self-incrimination. *State v. Carter*, 641 S.W.2d 54, 57 (Mo. banc 1982), *cert. denied* 461 U.S. 932, 103 S.Ct. 2096, 77 L.Ed.2d 305; *State v. Swinburne*, 324 S.W.2d 746, 750 (Mo. banc 1959).

Defendant relies primarily on the case of *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). That case stands for the proposition that a "criminal defendant who neither initiates a psychiatric evaluation *nor attempts to introduce any psychiatric evidence* may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." 451 U.S. at 468, 101 S.Ct. at 1876. In this case, the defendant not only attempted to introduce, but had introduced evidence regarding her mental condition, specifically her status as a victim of battered woman syndrome. Because this case does not fall within the rule enunciated in *Estelle*, that case is inapposite.

■ Because there was no error in admitting the testimony of Dr. Jacks, the post-conviction judge was not clearly erroneous in denying the post-conviction claims touching this issue. Counsel cannot be held ineffective for failing to make a nonmeritorious objection. *State v. Six*, 805 S.W.2d 159, 168 (Mo. banc), *cert. denied*, 502 U.S. 871, 112 S.Ct. 206, 116 L.Ed.2d 165 (1991).

## IV.

Livingston County Prosecutor Doug Roberts represented Ray Copeland in a bankruptcy proceeding in 1987. He represented Faye Copeland in connection with litigation against her by the Citizens Bank and Trust Company from 1987 to 1989. In the prosecution against her, defendant filed a written waiver of any conflict of interest by Roberts, hoping that, as prosecutor, Roberts would be amenable to a plea agreement.

During the pre-trial stages of Ray Copeland's trial, the defense moved to disqualify Doug Roberts for conflict of interest. Judge Webber overruled a defense motion to disqualify Roberts during Ray's trial. Specifically, he found, "matters discussed between Mr. Roberts and [Ray Copeland] occurred, for the most part, several years ago and none of the conversations concerned 'same or closely related matters' involved in this prosecution."

Ray suffered from degenerative brain disease making it unlikely that he would live long enough to be executed. In light of this fact, Roberts and Ray Copeland's attorney entered into a plea agreement whereby Ray would plead guilty to all counts and be sentenced to life without the possibility of probation or parole and the state would waive the death penalty in Faye Copeland's case. However, before entering into this agreement with Ray Copeland, Roberts had prepared, executed and mailed to all parties and Judge Webber (but not to the clerk) a motion to withdraw as prosecutor from the case.

When the two attorneys next went before Judge Webber to seek the court's approval of the plea agreement, Judge Webber stated that he had reconsidered defendant's motion to disqualify Roberts in Ray Copeland's case and sustained the motion. Roberts then moved to disqualify Judge Webber for cause. Judge Webber overruled the motion. Assistant Attorney General Hulshof was appointed to prosecute the case against Ray. When Ray attempted to enforce his plea agreement previously reached with Roberts, Hulshof refused to give effect to the agreement, arguing that it was not approved by the court and was still executory in nature.

Roberts helped prosecute defendant. During defendant's trial, she did not move to disqualify Roberts or Judge Webber until two days before sentencing. Judge Webber filed a four page opinion overruling defendant's motions.

### A.

■ "If the prosecuting attorney ... be interested or shall have been employed as counsel in any case where such employment is inconsistent with the duties of his office ... the court having criminal jurisdiction may appoint some other attorney to prosecute ... the cause." § 56.110. The decision to disqualify the prosecuting attorney and appoint another attorney to prosecute a criminal case lies within the sound discretion of the trial court. *State v. Newman,* 605 S.W.2d 781, 787 (Mo.1980); *State v. Fleer,* 851 S.W.2d 582, 601 (Mo.App.1993); *State v. Choate,* 722 S.W.2d 643, 647 (Mo.App.1986).

■ Judge Webber disqualified Roberts in Ray Copeland's case after Roberts expressed his intention to disqualify himself but still continued to negotiate a plea agreement with Ray Copeland. It is reasonable that Judge Webber sensed that Roberts' sympathies for Copeland may have prevented him from being an effective advocate for the state. In fact, Judge Webber testified at Faye's Rule 29.15 evidentiary hearing that after having observed Roberts throughout Faye's trial, and then in Ray's trial, Roberts' demeanor changed radically after Ray's trial attorney moved to disqualify Roberts. Judge Webber found the adversarial process to have broken down in that Roberts appeared to be advocating the defendant's position at the same time he voiced an intention to withdraw from the prosecution.

■ Defendant argues that Webber disqualified Roberts in order to prevent Roberts from entering into a plea agreement with Ray Copeland. This argument is without merit because Judge Webber did not have to remove Roberts to squelch the plea agreement. Rather, Judge Webber only had to refuse to approve it. A criminal defendant has no absolute right to have a guilty plea accepted, and a court may reject a plea in exercise of sound judicial discretion. *Santo-*

*bello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971). It cannot be said that Judge Webber abused his discretion in reconsidering the prior motion to disqualify Roberts in Ray Copeland's case. In any event, defendant cannot complain of errors committed in a case to which she was not a party.

### B.

■ As best can be discerned, it appears that defendant claims the trial court erred by not forcing Hulshof to recommend to the court the plea agreement entered into between Ray Copeland and Roberts. Upon his appointment, Hulshof took the position that any prior agreement between Roberts and Ray Copeland was executory. The general rule is that unless a plea agreement is embodied in the judgment of a court, a breach of such agreement by the state does not deprive an accused of liberty or any other constitutionally protected interest. *Mabry v. Johnson,* 467 U.S. 504, 507, 104 S.Ct. 2543, 2546, 81 L.Ed.2d 437 (1984). As previously noted, a criminal defendant has no absolute right to have a guilty plea accepted, and a court may reject a plea in exercise of sound judicial discretion. *Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971). It is only after a plea agreement is accepted by a court that it must be enforced. Our rules specifically authorize trial judges to reject plea agreements. *Rule 24.02(d)4.*

Therefore, no matter how fervently both the state and a defendant want to enter into a particular plea agreement, such agreement is of no effect unless or until the trial court accepts the agreement and embodies it in a judgment. The plea agreement here was never embodied in the trial court's judgment. Therefore, it remained executory until repudiated by the state. None of defendant's rights were violated by such repudiation and by the trial court's refusal to foist the agreement upon the unwilling substitute prosecutor.

### C.

■ Two days before defendant was to be sentenced, defendant's counsel moved

to disqualify Judge Webber. As grounds for disqualification, defendant argued that Judge Webber's actions in removing Roberts who had been pursuing plea negotiations in Ray's case, which would have waived death for defendant, demonstrated a predisposition to sentence defendant to death. The motion court found that Judge Webber's later decision to remove Roberts from Ray's case "does not raise any presumption or conclusion that Judge Webber had or exhibited any bias or prejudice against [defendant]." The mere fact that the trial judge has previously made adverse rulings against a defendant does not establish a disqualifying bias or prejudice by a trial judge. *State v. Reeter,* 848 S.W.2d 560, 565 (Mo.App.1993); *State v. Owens,* 759 S.W.2d 73, 75 (Mo.App.1988); *State v. Hoeber,* 737 S.W.2d 484, 486 (Mo. App.1987). As noted earlier, Judge Webber properly exercised his discretion in removing Roberts as prosecutor in Ray's case. This ruling exhibited no bias or predisposition to sentence defendant to death.

## V.

Defendant argues fifty-one instances of prosecutorial misconduct in the guilt phase opening statement and closing argument and the penalty phase opening statement and closing argument. Only one objection was made to the allegedly improper arguments. The motion for new trial identifies only one allegedly improper remark. In addition, the motion for new trial does not allege any plain error that would have required the trial court to declare a mistrial *sua sponte.* Notwithstanding the deficiencies in preservation of error, defendant collectively characterizes the fifty-one statements of the prosecutor as "outrageous."

### A.

Defense counsel objected during the guilt phase closing argument when the state referred to the list that defendant wrote containing the names of three of the victims. Referring to the "X" next to the names of Cowart, Freeman and Harvey, the prosecutor said, "Do you know what I think, folks, I think 'X' means they are dead. I think 'X' marks the spot." Defense counsel objected

to the statement as personalizing the argument. The court overruled the objection on that basis, but sustained the objection for the prosecutor injecting his own opinion of the evidence.

A prosecutor's statement of personal opinion or belief not drawn from the evidence is improper. *State v. Storey,* 901 S.W.2d 886, 901 (Mo. banc 1995). But a prosecutor may make reasonable inferences from the evidence. *State v. Shurn,* 866 S.W.2d 447, 460 (Mo. banc 1993), *cert. denied* — U.S. —, 115 S.Ct. 118, 130 L.Ed.2d 64 (1994). The evidence indicates that the prosecutor's statement was a reasonable inference. Therefore, the prosecutor could properly argue that the jury could infer the X's next to the names of the dead victims meant they had been killed.

### B.

Defendant claims the state's guilt phase opening statement improperly commented on uncharged crimes and injected hearsay evidence into the case.

The statements of uncharged crimes to which defendant refers are that the prosecutor said the evidence would show McCormick saw a transient named "R.C." leave the Springfield mission with Ray and that R.C. was never seen again, that when asked by the sheriff if defendant was acquainted with Paul Cowart and two other missing men who fit the same profile, that defendant denied knowing them and that the list of names, with an "X" next to them, included not only the names of Harvey, Freeman and Cowart but also the name of another missing man, Thomas Parks. Defendant argues it was improper personalization for the prosecutor to argue that the jurors would "experience, at least for a brief time, the life of a transient."

A prosecutor may refer to evidence that the state intends to introduce, including evidence that is arguably admissible, even if it is later excluded. *State v. Debler,* 856 S.W.2d 641, 656 (Mo. banc 1993). Reference during opening statement to arguably admissible evidence made in good faith with reasonable expectation that the evidence

will be produced is not cause for reversal, even though evidence is excluded from trial. *State v. Meanor,* 863 S.W.2d 884, 888 (Mo. banc 1993). In reviewing the opening statement for plain error, there is no manifest injustice unless the opening statement had a decisive effect on the jury's determination. *State v. Whitfield,* 837 S.W.2d 503, 511 (Mo. banc 1992).

All of the assertedly erroneous statements during the guilt phase opening statement were supported by admissible evidence or testimony during the guilt phase of the trial. Moreover, the statement that the jurors would briefly experience the life of a transient was true. Obviously, the jury came to know what the lives of these homeless men were after they came in contact with the Copelands. None of the testifying transients were victims, and it cannot be fairly argued that the jury was asked to stand in the place of the victims. The statement that Jack McCormick saw another transient leave the Springfield mission with Ray Copeland leaves no implication that the man was killed by Ray or defendant, particularly where subsequent testimony showed that Ray Copeland told McCormick the transient went to see relatives in California.

■ Finally, the hearsay statements complained of were statements and conduct by Ray Copeland. They were properly admissible at trial either because they were not hearsay at all or because they were declarations of a co-conspirator. A conspiracy does not have to be established before a coconspirator's potential testimony can be referenced in opening statement. There was no error in the guilt phase opening statement, and the motion court was not clearly erroneous in rejecting the claims associated with counsel's failure to object to the guilt phase opening statement.

### C.

■ The penalty phase opening statement included a comment by the prosecutor that he was going to ask them whether "those aggravating circumstances justify . . . that Mrs. Copeland should suffer the death penalty." Defendant condemns this statement for being a misstatement of law. Of course, it is not a misstatement of law. The preliminary determination that must be made by every jury in the penalty phase of a capital case is whether there are aggravating circumstances justifying the giving of the death penalty. There was no error, plain or otherwise, in the penalty opening statement.

### D.

■ Defendant asserts various other unpreserved claims of erroneous argument during the guilt phase. Most notably, she complains of the prosecutor's reference to facts not in evidence when the prosecutor likened the Copeland scheme to "Twentieth Century cattle rustling," and a reference to a quote attributed to Willie Sutton, a well-known bank robber, that he robbed banks because "that's where they keep the money." An argument is not personalized where it does not suggest a personal danger to the jury or their families if the defendant were to be acquitted. *State v. Raspberry,* 452 S.W.2d 169, 172 (Mo.1970); *State v. Hamilton,* 847 S.W.2d 198, 200 (Mo.App.1993). The evidence here showed that Ray and Faye in effect stole cattle by using checks fraudulently written on banks. The comments made during closing argument regarding "cattle rustling" are a fair reference to the evidence and do not refer to crimes other than the scheme to obtain cattle by illegal means. There was no effort to improperly compare Faye Copeland's crimes as being equal to or more serious than Willie Sutton's crimes. There is neither manifest injustice nor ineffective assistance of counsel in failing to object.

■ Other asserted errors in the guilt phase closing arguments are raised, including asking the jury to consider what the state thought was its most compelling piece of evidence, referring to a letter mailed from defendant to her husband while he was in jail, arguing that Faye was lying when she told the sheriff she did not know Cowart or two other missing men who had been connected to the Copelands' scheme, a reference to the Bible, summarizing the jury instructions, calling Faye a "nasty-mouth woman," and commenting on argument made by defense counsel. An extensive discussion of the

claims of error would be of no precedential value. *Rule 30.25(b)*. It is sufficient to say the arguments did not constitute error, plain or otherwise, and counsel was not ineffective in failing to object to the arguments.

### E.

■ Defendant complains further that during the penalty phase closing argument, the prosecutor made the following objectionable statements: a second reference to the Bible, an argument that defendant's age should not be a mitigating circumstance, an argument that one of the victims may have been shot while sleeping, a reference to the Harry Truman quote, "The buck stops here," an argument that the jury must determine whose lives are more valuable, an argument that the jury must decide who to believe—a state employee or Dr. Hutchinson, a statement that the Copeland children were "little Mark Anthonys" who had "come to bury their father, not praise him" and, finally, that it is "obscene" and "enough to make a person vomit" that defendant would use the stolen clothing of the dead victims to make quilts. Collectively, the arguments present a strong case for imposing the death penalty and for discounting the evidence and arguments in mitigation. Each argument was supported by the record, was not an improper personalization, and was not an improper comment on law or on facts outside the record. Therefore, there was no error, plain or otherwise, and no ineffective assistance of counsel in failing to object to the argument.

### F.

■ The prosecutor made two comments in the state's closing argument during the guilt phase and two comments during the state's closing argument in the punishment phase that may arguably have constituted reversible error had a timely objection been raised. We examine those only for plain error and ineffective assistance of counsel in failing to object.

■ During the guilt phase, the prosecutor argued, "There has never been a case in the history of our state that is stronger for first-degree murder as far as deliberation," and "Never before in the modern history of our state of Missouri have we had such a vile, horrible chain of crimes." During the closing argument of the punishment phase, the prosecutor said, "[T]here has never, ever been a more complete and utter disregard for the sanctity of human life as this case of Faye Copeland." Later, the prosecutor told the jury that after watching television reports of murders in Los Angeles by street gang drug lords, "[I]t's the same thing, right here in our back yards ... Innocent, blameless victims being murdered for profit. Completely innocent persons being murdered because of their potential witness capabilities ..."

Each of these four comments is an improper comparison of this crime to crimes outside the record.

In *State v. Storey*, 901 S.W.2d 886 (Mo. banc 1995), the prosecutor made four separate erroneous arguments. One of those arguments was an indirect comparison to crimes outside the record by stating, "This is about the most brutal slaying ever to occur in this county." 901 S.W.2d at 900. This Court concluded that the four separate arguments were "egregious errors, each compounding the other" and "failure to object could not be justified as trial strategy." *Id.* at 902.

In *State v. Tokar*, 918 S.W.2d 753 (Mo. banc 1996), this Court noted that counsel's failure to object to improper argument does not automatically translate into ineffective assistance of counsel. There, an improper argument was made that jurors "should pray that their children will not have to experience what the [victims'] children went through." *Id.* at 768. The Court held that failing to object to that argument did not constitute ineffective assistance of counsel. In reaching its conclusion, the Court pointed out that in determining ineffective assistance of counsel, several factors must be weighed, including counsel's reason for not objecting, whether the jury was properly instructed on the law, and most importantly, whether, considering the total context of the trial, a reasonable probability exists that the outcome would have been different absent the improper argument.

■ Defense counsel testified at defendant's post-conviction hearing that part of his

strategy was to avoid making objections that served no meaningful purpose or that might tend to alienate the jury. To restate what was said in *Tokar*, seasoned trial counsel may choose not to object to an otherwise improper argument for a strategic purpose where it is feared that the objection might irritate the jury and highlight the statement complained of. 918 S.W.2d at 768.

The jury in this case was properly instructed on the law. Their instructions included a cautionary statement that argument by counsel was not evidence. Again, as noted in *Tokar*, that factor militates against a finding of ineffective assistance of counsel in failing to object to argument.

The record included overwhelming evidence of defendant's involvement in the deliberate murder of the five victims, including more than two hundred exhibits, testimony by sixty witnesses, and a trial that extended over six days. In view of the voluminous evidence of defendant's involvement in a series of murders taking place over an extended time period, the two isolated statements in the guilt phase and two in the punishment phase did not result in manifest injustice, and the comments do not undermine this Court's confidence in the outcome of the case so as to constitute ineffective assistance by counsel in failing to object to the comments. The claim is denied.

## VI.

Defendant claims the motion court erred in denying her Rule 29.15 motion, arguing that counsel was ineffective in failing to present vital information establishing that Ray had systematically verbally and emotionally abused her. She also argues that trial counsel was ineffective in failing to obtain an adequate mental health evaluation for the guilt and penalty stages of her trial in that counsel hired Dr. Hutchinson rather than Dr. Lenore Walker as her expert.

## A.

With regard to the claim that counsel failed during the trial to adduce evidence of Ray's abuse toward Faye, several witnesses were called, including a son, Wayne Copeland, a daughter, Betty Gibson, and two daughters-in-law, Bonnie and Brenda Copeland. In addition, a friend named Bonnie Thompson was called. None of these witnesses offered substantial testimony to support the claim that Ray was violent toward Faye. However, Wayne did testify that Ray had been violent toward him.

At the subsequent Rule 29.15 motion hearing, witnesses recanted the earlier testimony. In addition, defendant's grandson, Michael Copeland, also testified. Each of the witnesses at the post-conviction hearing described several different stories of how Ray had physically and emotionally abused animals, defendant, and the witnesses themselves.

In the Rule 29.15 proceeding, appellate review is limited to whether the findings and conclusions of the post-conviction court are clearly erroneous. *Rule 29.15(k)*. To find ineffective assistance of counsel, a defendant must show that his attorney did not perform to the degree of skill of a reasonably competent attorney and the defendant was thereby prejudiced. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

In this case, the motion court specifically found that trial counsel offered the testimony that was available at the time of trial. The record supports that conclusion. Moreover, the postconviction court questioned the credibility of family members, noting that Ray died between the time of trial and the time of the motion hearing. The findings of the motion court in this regard are not clearly erroneous. Defendant has not established that counsel's performance failed to conform with that degree of skill expected of a reasonably competent attorney.

## B.

Defense counsel hired Dr. Hutchinson as a treating therapist to provide counseling services for defendant. Later, Dr. Hutchinson took on the role of a forensic psychologist. Defendant now claims that it was not appropriate for defense counsel to utilize Dr. Hutchinson as both a treating therapist and a forensic psychologist. De-

fendant argues that defense counsel should have called Dr. Lenore Walker as the forensic psychologist.

The motion court found and the record discloses that Dr. Hutchinson was clearly qualified to testify. It is not at all clear what Dr. Walker's testimony would have added during the penalty phase, the only stage at which it would have been admissible, that was not included in the testimony of Dr. Hutchinson. In any event, trial counsel cannot be held ineffective for failing to shop for a more favorable expert witness. *State v. Mease*, 842 S.W.2d 98, 114 (Mo. banc 1992), *cert. denied*, 508 U.S. 918, 113 S.Ct. 2363, 124 L.Ed.2d 269 (1993). The claims of ineffective assistance of counsel in failing to investigate or present adequate evidence of the battered spouse syndrome are denied.

## VII.

Defendant next argues a series of unconnected claims of error, plain error, and ineffectiveness of counsel associated with the admission of evidence.

### A.

The state presented evidence during the guilt phase that various homeless persons other than the victims had been connected to the Copelands through employment from various shelters for the homeless but that law enforcement was unable to locate all those persons. In one instance, belongings of a missing homeless man were identified as being found in a closet of the Copeland home. In another instance, defendant's son was asked on cross-examination if "ten individuals over the last three to four years" worked for the Copelands and lived in their home. He replied, "Maybe five." Defendant claims this was inadmissible evidence of uncharged crimes. No objection was made to this evidence.

The state's inability to locate all the vagabonds who previously worked for or were offered work by the Copelands is not evidence of other crimes. Since this was not evidence of other crimes, counsel was not ineffective in failing to make a nonmeritorious objection.

### B.

Defendant next argues that the trial court admitted hearsay evidence in fourteen different instances. Only two of the complained of statements were preserved for review by being objected to before the trial court.

Keith Albrecht testified that after he heard about the Copeland case on the news, he contacted the police to suggest that they check out a barn on the Bryan farm. The trial court sustained the objection insofar as the question called for hearsay testimony, but overruled it insofar as the question called for the witness to state his reaction or conduct subsequent to hearing a news broadcast. Albrecht testified what he did after hearing about the Copeland case on the news. At no time did he state the contents of the media coverage. The out-of-court statement was admissible because it was offered to show its effect on the conduct of the hearer and not for the truth of the matter asserted. *State v. Murray*, 744 S.W.2d 762, 773 (Mo. banc), *cert. denied*, 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988). The trial court did not err in its ruling on the objection.

The other preserved objection came after Rose Clevenger testified on direct that Jack McCormick feared for his safety because the Copelands "had tried to kill him." This testimony came in response to the cross-examination of Jack McCormick. Defense counsel brought out the fact that McCormick had the opportunity to tell others about the crimes at a point near in time to their occurrence, but failed to do so. As a result, the state was entitled to interrogate the witness as to matters that tended to refute, weaken or remove inferences resulting from a defense cross-examination. *State v. Herndon*, 670 S.W.2d 32, 38 (Mo.App. 1984). The trial court did not err in overruling the hearsay objection to the Clevenger testimony.

The other twelve claims of hearsay are not preserved. In each instance, the testimony complained of was not hearsay, was the subject of a hearsay exception, was confirmed by the testimony of a witness who was subject to cross-examination, or was so innocuous as

to not be prejudicial. No precedential purpose would be served by an extended discussion. It suffices here to say that there was no plain error and no ineffectiveness of counsel by failing to object to the alleged hearsay statements. *See Rule 30.25(b).*

### C.

Defendant next complains that the court admitted ten exhibits without adequate foundation. These exhibits include (1) Faye's signed card giving permission to open mail, (2) letters from Faye to Ray, (3) pasture rental agreements, (4) handwriting examples, (5) Springfield Victory Mission log entries relating to McCormick, and (6) Home Sweet Home Mission records relating to one of the victims, Wayne Warner.

■ At trial, the state offered a jail permission-to-open-mail card that defendant signed upon being booked into jail. Defense counsel objected to the admission of the signed card on the basis that defendant's signature was not properly authenticated on the writing. In laying the foundation for the document, the sheriff testified that in order to monitor security and contraband, inmates were required to send letters through the United States mail and that mail coming into the jail was opened, inspected and passed on to the recipient. The sheriff further testified that in order for inmates to receive mail at the jail, upon booking they are read and asked to sign a card stating that jail personnel will open their mail and examine it. The sheriff testified that this consent card is kept in the ordinary course of the business of operating the jail. The document was never used as an exemplar or to identify a document that defendant wrote. Rather, it was admitted solely to show why jailers open inmate mail.

Whether a foundation is sufficient to admit an exhibit is a matter within the trial court's broad discretion. *State v. Zimmerman,* 886 S.W.2d 684, 691 (Mo.App.1994). In dealing with a business record, considerable discretion is vested in the trial court. *State v. Williams,* 797 S.W.2d 734, 738–39 (Mo.App. 1990). The state laid a proper foundation to admit this document as a business record. § 490.660, et seq.

■ The sheriff further testified that he opened and inspected a letter sent from Faye Copeland by United States mail to Ray Copeland, who was also in the jail. The sheriff made a copy of the letter and gave the copy to the major case squad. Defense counsel objected to the introduction of the letter, based on relevancy. The trial court admitted the document over that objection. A handwriting expert later testified that after having examined the exemplars written by defendant, the letter appeared to have been written by the same person who wrote the exemplars.

The exemplars used are also complained of here as being of suspicious origin. The exemplars were letters sent to the sheriff by defendant. In the letters, defendant identified herself as "Ray Copeland's wife." She asked that visits be arranged with her relatives or with Ray. The sheriff complied with those requests. The authenticity of the documents was sufficiently established by circumstantial evidence. There was no abuse of trial court discretion in finding the documents authentic and admitting them. The letter was properly admitted. *Cummins v. Dixon,* 265 S.W.2d 386, 394 (Mo.1954); *State v. Clark,* 592 S.W.2d 709, 717 (Mo. banc 1979), *cert. denied,* 449 U.S. 847, 101 S.Ct. 132, 66 L.Ed.2d 57 (1980).

No objection was interposed to the authenticity of the pasture rental agreements or the Springfield Victory Mission log books based on an inadequate foundation having been established. The Home Sweet Home Mission records were never admitted as an exhibit, and no objection was raised to testimony regarding those records. Had an objection been raised to the mission records, there is little doubt that authenticity could have been established under the business records act. Admitting these documents did not result in manifest injustice resulting in plain error, and no ineffective assistance of counsel occurred when counsel failed to object to those records.

### D.

Defendant next argues that the trial court plainly erred in admitting a number of in-

stances of speculative testimony from prosecution witnesses. Defendant objected to none of these allegedly improper statements. Indeed, three of the alleged errors relate to matters elicited by defense counsel on cross-examination.

■ According to the defendant's brief, the most egregious speculation occurred when defense counsel elicited certain testimony of Dr. Bridgens, the pathologist who did the autopsies. In responding to a defense inquiry as to the relative positions of the shooter and one of the bodies, Dr. Bridgens speculated "the deceased was probably asleep at the time the wounds were inflicted.... Somebody walked up, put a gun to the top of his head, and blew him away." The speculation that the victim may have been asleep rather than awake when murdered does not add prejudice to the defendant and may, to some, make the crime seem less vile. The second sentence of the answer is not speculation at all, but a firm expert opinion. Counsel was not ineffective in failing to object to Dr. Bridgens' testimony. Obviously, counsel cannot predict with certainty the exact words a witness will use when testifying.

We find no plain error or ineffectiveness of counsel in what defendant views as the most egregious speculation. The Court has reviewed the other claims of speculative testimony and finds each is either not objectionable or not prejudicial. Again, an extended discussion would be of no precedential value. *See Rule 30.25(b).*

#### E.

Defendant argues that there were a series of "general fair trial violations" that occurred when testimony came in without objection and which was not preserved in the motion for new trial. Having examined all the allegedly improper testimony, the claims are without merit. Defendant does not suggest that counsel was ineffective for not objecting or raising these issues in her motion for new trial, no plain error resulted, and further discussion is not merited.

#### VIII.

Defendant claims error, plain error, and ineffective assistance of counsel because the five first degree murder verdict-directing instructions were not supported by evidence showing guilt beyond a reasonable doubt, and because the five instructions are claimed to be confusing and misleading.

#### A.

■ In reviewing the sufficiency of the evidence in a criminal case, the evidence is viewed in a light most favorable to the verdict. *State v. Mallett,* 732 S.W.2d 527, 530 (Mo. banc), *cert. denied,* 484 U.S. 933, 108 S.Ct. 309, 98 L.Ed.2d 267 (1987). The appellate court then determines whether there is sufficient evidence from which a reasonable person could have found the defendant guilty beyond a reasonable doubt. *State v. Dulany,* 781 S.W.2d 52, 55 (Mo. banc 1989). All persons who act together with a common intent and purpose in the commission of a crime are equally guilty, whether they are a principal or merely aid and abet the crime. *State v. Isa,* 850 S.W.2d 876, 898 (Mo. banc 1993). All that need be proved is that the defendant, with the purpose of promoting the crimes of murder as charged, agreed to aid or attempted to aid Ray Copeland in planning, committing or attempting to commit the murders. *§ 562.041.1(2).*

■ Here the evidence shows or permits the following inferences: that there was enough clothing in defendant's guest bedroom closet for at least five men; that the clothing and other belongings were those of the deceased men; that defendant took pains to prevent outsiders from associating her and her husband with the missing men; that over the time period involved she had detailed knowledge of the insufficient funds checks-for-cattle scheme; that she kept a list with entries made at different times of those persons who stayed on the farm, marking the names of those who had been killed with an "X"; and that she wrote a note to her husband reporting the lack of progress in the search on their farm for bodies, expressing her opinion that when the search warrant expired, things would cool down. These and other items of evidence interconnect and,

amassed together, lead to the inescapable conclusion that defendant was intimately involved as a co-participant in the premeditated murder of the five victims. There was sufficient evidence to submit the five verdict-directing instructions to the jury.

### B.

Defendant asserts for the first time in her post-conviction motion that the verdict-directing instructions are erroneous because they permit the jury to find her guilty even though the jurors did not believe she reflected on the murder.

██ The instructions were modeled after MAI–CR3d 304.04, 313.02 and the appropriate Notes on Use. The fourth paragraph of each ˙verdict-directing instruction required the jury to find beyond a reasonable doubt that "with the purpose of promoting or furthering the death of [the victim] the defendant acted together with or aided Ray Copeland in causing the death of [the victim] and reflected upon the matter coolly and fully." This Court recently reviewed identical language quoted from the fourth paragraph. We held that the quoted language makes it clear to the jury that it must find the accomplice to have deliberated upon the crime charged in order to return a verdict of guilt. *State v. Isa,* 850 S.W.2d 876, 899 (Mo. banc 1993). There was no error in giving the verdict-directing instructions and no ineffective assistance of counsel in failing to object to these correct instructions.

### IX.

By a pre-trial motion *in limine,* defendant objected to any out-of-court statements or acts by Ray being admitted in evidence until a conspiracy was established. The trial court determined the pre-trial motion was premature.

Later, just after the prosecutor asked McCormick where he was when introduced to Ray Copeland, defense counsel requested the court to order the state not to introduce conversations between Ray Copeland and McCormick. The objection was overruled.

McCormick then testified that he met Ray Copeland at the mission in Springfield and that Ray Copeland offered him a job working with cattle, making $50 per day plus room and board. Ray also told McCormick that McCormick would need a Missouri driver's license. Thereafter, no other objections were interposed. No request was made that the objection be continuing.

Defendant claims that the out-of-court statements of Ray Copeland are not admissible as statements of a co-conspirator because, generally, such statements are inadmissible hearsay unless there is preliminary evidence of an agreement between the defendant and the declarant to engage in an unlawful act. *State v. Cornman,* 695 S.W.2d 443, 446 (Mo. banc 1985).

██ Motions *in limine* preserve nothing for review unless objections are made at the appropriate time during the case. *State v. Chambers,* 884 S.W.2d 113, 115 (Mo.App. 1994). Moreover, the defendant's brief does not direct the reader to any specific statements of McCormick claimed to be hearsay. As best can be perceived, defendant believes that the statements of Ray Copeland made to McCormick regarding employment at the Springfield, Missouri, mission were hearsay.

██ Not all out-of-court statements are hearsay. The hearsay rule only prohibits admission of evidence of out-of-court statements offered to prove the truth of the out-of-court declaration. *State v. Parker,* 886 S.W.2d 908, 925 (Mo. banc), *cert. denied,* —— U.S. ——, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995). Defendant overlooks the well-established "verbal acts" rule. Utterances made contemporaneously with or immediately preparatory to an act which is material to the litigation that tends to explain, illustrate or show the object or motive of an equivocal act and which are offered irrespective of the truth of any assertion they contain, are not hearsay and are admissible. 6 Wigmore, *Evidence* § 1772 (Chadbourn rev.1976); *see also State v. Talbert,* 454 S.W.2d 1, 3 (Mo. 1970); *State v. McClure,* 504 S.W.2d 664, 671–72 (Mo.App.1974).

██ In this case, it is of no consequence whether Ray Copeland was truthful when he offered work to McCormick, when he said he would take McCormick back to Mooresville,

or when he explained the plan for obtaining a post office box and a checking account in a nearby community. Ray Copeland's statements were offered to show that the statements were made to induce action by McCormick and to explain McCormick's reason for becoming involved in the Copeland scheme. Ray was shown to make similar offers of employment to others, including some of the victims. None of these statements were offered for the truth of Ray's assertions but rather to show by Ray's "verbal acts" how the victims became caught up in the Copelands' criminal plot. The statements to which defendant objected were not hearsay.

▮ Even assuming that defendant is correct that conspiracy must be established before hearsay statements of a co-conspirator may be put in evidence, defendant cites no authority applying the rule where there is no timely objection to specific hearsay evidence. Assuming somewhere in the record there is an actual hearsay statement of Ray Copeland, there was ample evidence to infer an agreement between defendant and Ray Copeland to engage in unlawful conduct. Even if a proper objection had been interposed by defense counsel and sustained, the state clearly established defendant's participation in the criminal conspiracy from defendant's words, conduct and written memoranda. Ultimately the statements of Ray Copeland in furtherance of the conspiracy would be admissible as an exception to the hearsay rule. This claim is without merit.

### X.

Defendant argues next that the trial court erred in giving instruction No. 6, which defines accomplice liability and is patterned after MAI–CR3d 304.04. Specifically, defendant claims the instruction improperly permitted the jury to find she was an accomplice because she "encouraged" her husband to commit murder. She correctly points out that the word "encourage" is not in the accomplice liability statute. That statute makes one criminally liable who "with the purpose of promoting the commission of an offense [ ] aids or agrees to aid" in the commission of the offense. *§ 562.041.1(2).*

▮ Following the enactment of § 562.041 in 1979, this Court has persisted in the view that encouraging the commission of a crime is one form of aiding in its commission. "[A] conviction of capital murder in Missouri under a theory of accomplice liability requires the jury to have found the defendant acted with or aided or encouraged another person for the purpose of committing the murder." *State v. Reuscher,* 827 S.W.2d 710, 717 (Mo. banc 1992), *cert. denied* —— U.S. ——, 115 S.Ct. 1982, 131 L.Ed.2d 869 (1995); *State v. Kilgore,* 771 S.W.2d 57, 68 (Mo. banc), *cert. denied* 493 U.S. 874, 110 S.Ct. 211, 107 L.Ed.2d 164 (1989). The reason for this is that nothing in the statute expresses a legislative intent to change the centuries-old concept that to aid another in committing a crime is consummated by encouraging another to do a prohibited act.

▮ Even assuming, which we do not, that it was error to use the word "encourage" or one of its derivatives in the accomplice liability instruction, that error was corrected in each of the verdict instructions where paragraph four specifically required the jury to believe beyond a reasonable doubt that the defendant "with the purpose of promoting or furthering the death of [the victim] acted together with or aided Roy Copeland in causing the death of the victim and reflected upon this matter coolly and fully." The word "encouraged" is not found in any of the verdict directing instructions. Thus, any potential error in giving instruction No. 6 was corrected by the finding required by the giving of the verdict-directing instructions.

### XI.

At the time of defendant's arrest, there were pending investigations regarding bad checks as to Cowart, Freeman, Warner and Harvey. Because of those investigations, the trial court submitted two statutory aggravators as to those victims. *§§ 565.032.2(4) and (12).* The submissions were as follows:

In determining the punishment to be assessed against the defendant for the murder of [Cowart, Freeman, Warner or Harvey], you must first unanimously determine whether one or more of the following aggravating circumstances exists:

1. Whether the defendant murdered [Cowart, Freeman, Warner or Harvey] for the purpose of defendant receiving money or any other thing of monetary value from [them].

2. Whether [Cowart, Freeman, Warner or Harvey] was a potential witness in a pending investigation of a fraudulent scheme involving the purchase of cattle with bad checks and was killed as a result of his status as a potential witness

. . . .

There was no investigation pending at the time regarding victim Murphy, and the court only submitted the first aggravator as to him. The jury found both aggravators as to all victims except Murphy.

■ Defendant now claims that the first aggravator was insufficient in that the bad checks were passed and the cattle obtained prior to the murders and, therefore, the murders were not committed in order to obtain money but were subsequent actions. Defendant incorrectly argues that the statutory language "for the purpose of" requires the murder to precede receiving money or something of value.

Missouri cases hold to the contrary. In *State v. Laws,* this Court held that for this aggravator to apply, the murder only need be designed to facilitate the enjoyment of stolen money or property. 661 S.W.2d 526, 528–33 (Mo. banc 1983), *cert. denied* 467 U.S. 1210, 104 S.Ct. 2401, 81 L.Ed.2d 357 (1984). *See also State v. Gilmore,* 661 S.W.2d 519, 522 (Mo. banc 1983); *cert. denied* 466 U.S. 945, 104 S.Ct. 1931, 80 L.Ed.2d 476 (1984); and *State v. Kilgore,* 771 S.W.2d 57, 60 (Mo. banc), *cert. denied* 493 U.S. 874, 110 S.Ct. 211, 107 L.Ed.2d 164 (1989).

■ Defendant also argues that the investigations into the bad checks written at the sale barns did not begin until after the deaths of each victim. Therefore, she argues, there was no investigation pending at the time of any murder. This Court held in *State v. Brown,* 902 S.W.2d 278, 294 (Mo. banc), *cert. denied,* —— U.S. ——, 116 S.Ct. 679, 133 L.Ed.2d 527 (1995), that an investigation need not be pending at the time of a murder in order to establish the statutory aggravator. All that is necessary is that a reasonable juror must be able to infer that the defendant foresaw an investigation and killed the victim to forestall that development.

The state adduced sufficient evidence during the penalty phase to support the jury's finding of both statutory aggravators beyond a reasonable doubt as to all four murders. Counsel cannot be ineffective for failing to object to the submission of these two properly submitted statutory aggravators in an instruction.

### XII.

■ At the evidentiary hearing on the post-conviction motion, members of the defendant's family gave testimony indicating defense counsel smelled of alcohol, appeared intoxicated or had a hangover at various times during the trial. None claimed to have seen counsel drinking alcoholic beverages.

By contrast, defense counsel testified he had only consumed intoxicants in moderate amounts in the evening, after the day's work was completed. The second chair defense lawyer at defendant's trial observed defense counsel before, during and after the trial, as well as while working on the case. He stated defense counsel was never under the influence of alcohol, although the two lawyers went out for a drink one night during trial. The trial judge and the prosecuting attorney both testified they observed defense counsel during the trial and did not believe defense counsel was intoxicated. The motion court was not clearly erroneous in determining the allegations of intoxication to be refuted by this evidence.

■ Defendant also moved to disqualify the judge at the postconviction motion proceeding. In support of the motion to disqualify, she claimed that she subpoenaed defense counsel's personnel records from the public defender's office. She alleged that the postconviction motion judge then asked a member of the public defender commission why the commission did not move to quash the subpoenas. That allegation was refuted by the public defender commissioner's affidavit denying that any such question was asked by

the post-conviction judge. No error was committed in overruling the motion to disqualify.

## XIII.

■ The Court is required to review the sentence of death imposed in this case. § 565.035.3. After a careful examination of the record, we conclude the sentences were not imposed "under the influence of passion, prejudice or any other arbitrary factor" and the evidence supports the jury's finding of the two statutory aggravating circumstances under § 565.032.2(4) and (12).

The Court has examined the evidence in this case and determines that the death sentences, when compared to similar cases, is neither excessive nor disproportionate. *See State v. Weaver,* 912 S.W.2d 499, 523 (Mo. banc 1995); *State v. Shurn,* 866 S.W.2d 447, 467–68 (Mo. banc 1993), *cert. denied* —— U.S. ——, 115 S.Ct. 118, 130 L.Ed.2d 64 (1994); *State v. Parker,* 886 S.W.2d 908, 933–34 (Mo. banc), *cert. denied* —— U.S. ——, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995); *State v. Grubbs,* 724 S.W.2d 494, 501 (Mo. banc), *cert. denied* 482 U.S. 931, 107 S.Ct. 3220, 96 L.Ed.2d 707 (1987); *State v. Williams,* 652 S.W.2d 102, 113–14 (Mo. banc), *cert. denied* 459 U.S. 1113, 103 S.Ct. 746, 74 L.Ed.2d 966 (1983); *State v. Blair,* 638 S.W.2d 739, 759–60 (Mo. banc 1982), *cert. denied,* 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1030 (1983). In each of the above cases, defendants were sentenced to death who had murdered victims who were witnesses or potential witnesses. The facts here are also consistent with death sentences affirmed in cases when the victims were murdered for money. *State v. Tokar,* 918 S.W.2d 753, 772–73 (Mo. banc 1996); *State v. Ramsey,* 864 S.W.2d 320, 327 (Mo. banc 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1664, 128 L.Ed.2d 380 (1994); *State v. Murray,* 744 S.W.2d 762, 775 (Mo. banc), *cert. denied,* 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988); *State v. Pollard,* 735 S.W.2d 345, 349–50 (Mo. banc 1987), *cert. denied,* 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 682 (1988); *State v. Young,* 701 S.W.2d 429, 438 (Mo. banc 1985), *cert. denied* 476 U.S. 1109, 106 S.Ct. 1959, 90 L.Ed.2d 367 (1986).

## XIV.

Defendant complains of plain error in the trial court allowing certain questions to be asked on *voir dire.* She also argues that the post-conviction court clearly erred in denying relief on "Faye's related claims" in the Rule 29.15 motion.

■ We first address the "related claims" asserted to be found in the post-conviction motion. The post-conviction motion, not including attached exhibits, is more than two hundred pages in length. The post-conviction court's findings of fact and conclusions of law consist of more than fifty-seven paragraphs and extend to over twenty-eight pages. This Court is not obliged to scour the record to determine what "related claims" were made in the two hundred page petition or the relevant rulings regarding each of those claims. It suffices here to say that, on appeal, the claims relating to counsel's failure to object to *voir dire* have not been preserved for our review by the brief on appeal and are thus procedurally barred. The only basis for reviewing the *voir dire* questioning is plain error.

■ Defendant argues that a series of questions or statements made by the prosecutors were plain error. The statements or questions included the following: a statement was made by Hulshoff that he was "an assistant attorney general" and the trial was a "very important case"; Hulshoff told the jury that the *voir dire* was the most important part of the trial; another prosecutor explained that from time to time, objections would be made because both sides want to keep out unreliable testimony and the state wanted to convince the jury beyond a reasonable doubt of defendant's guilt; that the state asked for commitments from the jury when the prosecutor asked, "Is there anyone who cannot find the defendant guilty unless they put a gun in her hand?"; that the credibility of witnesses were improperly bolstered when, in asking if the panel knew of potential witnesses, the prosecutor stated he wanted "to mention a couple of other names of individuals who had gained recognition statewide"; the prosecutor told the panel not to consider sympathy in sentencing; and the

prosecutor said defendant could be held liable for Ray's conduct if she encouraged such conduct.

■ The question of what may be asked on *voir dire* is left largely to the discretion of the trial court. *State v. Parker*, 886 S.W.2d 908, 920–21 (Mo. banc), *cert. denied*, —— U.S. ——, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995). A review of the record reveals that none of the complaints made here by the defendant rise to the level of error, much less plain error. This claim is denied.

### XV.

During *voir dire*, when the panel was asked if they could follow the court's instructions in a case involving the death penalty, venireperson Zinn stated, "Because of religious reasons, I don't feel qualified." She later stated, "I just don't feel qualified to pass judgment on anybody." Venireperson Ward said, "I don't believe in capital punishment even if the evidence is so against a person. As a Christian, I don't believe in it." Venireperson Schmidt said that his views on the death penalty were strong, he was a Christian, and he could not consider the death penalty. Venireperson Thomas stated, "It would be a little hard, a little difficult" to consider imposing the death penalty, although later, when asked by the state if she could consider it, she responded, "I think I could."

■ The trial court has wide discretion in determining the qualifications of jurors, and its decision thereon will not be disturbed absent a clear abuse of discretion and a real probability of injury to the complaining party. *State v. Smith*, 649 S.W.2d 417, 422 (Mo. banc 1983). Venirepersons Zinn, Ward and Schmidt were unequivocal in their unwillingness to follow the instructions regarding the death penalty. There was no error in those strikes. *State v. Harris*, 870 S.W.2d 798, 806 (Mo. banc), *cert. denied*, —— U.S. ——, 115 S.Ct. 371, 130 L.Ed.2d 323 (1994). As to venireperson Thomas, she was unable to state affirmatively that she would follow the court's instructions. Rather, she equivocated. Under the circumstances it cannot be said the trial court abused discretion in striking Thomas *sua sponte*. *See*

*State v. Sandles*, 740 S.W.2d 169, 178 (Mo. banc 1987), *cert. denied* 485 U.S. 993, 108 S.Ct. 1303, 99 L.Ed.2d 513 (1988). Since there was no error in making the strike, defense counsel's failure to oppose the court striking Thomas cannot be characterized as ineffective assistance of counsel.

### XVI.

■ On October 9, 1989, Sheriff Coon, Officer Brinkley and other officers went to the Copeland residence with a search warrant. After one of the officers read defendant the search warrant, Sheriff Coon and Officer Brinkley began to talk to her. Both officers were in plain clothes. During a two-hour period during which the conversation took place, defendant stated that she did not know Cowart. Further investigation determined that some of his clothing was found in her guest closet. She also stated that she did not know Hudson and Parks, although their names appeared on a list in her handwriting found in a camera case. She admitted knowing McCormick. Finally, she stated she would like to contact her son and her attorney. She made no attempt to use the telephone.

Subsequently, Sheriff Coon transported defendant to the Livingston County Sheriff's Department to see Ray Copeland, who was then in custody. She was not handcuffed and was not placed under arrest at that time. Approximately forty-five minutes after they arrived at the sheriff's department, defendant was placed under arrest.

■ Defendant argues that statements she made during that interview should not be admissible in evidence. It is, of course, well established that the prosecution may not use statements "stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). *Miranda* defines custodial interrogation as questioning by law enforcement officers after a person is taken into custody or deprived of freedom in any significant way. *Id.* Missouri courts follow

that same definition. *State v. Huse,* 842 S.W.2d 579, 582 (Mo.App.1992).

In the present case, neither Sheriff Coon nor Officer Brinkley restricted defendant's freedom prior to arrival at the jail. Similarly, other officers who were executing the search warrant did not restrict her freedom. In fact, defendant moved throughout the house, doing chores while the officers executed the search warrant. Because there is no indication that defendant's situation satisfied the requirements of a custodial interrogation, the trial court did not err in denying the defendant's motion to suppress evidence.

## XVII.

The trial court rejected a proposed instruction containing additional mitigating circumstances which, defendant claims, should have been part of the mitigating instructions as to each of the five murders.

■ The mitigation evidence instructions given by the trial court read:

As to [each count], if you decide that one or more sufficient aggravating circumstances exist to warrant the imposition of death, as submitted in [the verdict directing instruction], each of you must then determine whether one or more mitigating circumstances exist which outweigh the aggravating circumstance or circumstances so found to exist. In deciding that question, you may consider all of the evidence relating to the murder of [each victim].

You may also consider:

1. Whether the defendant has no significant history of prior criminal activity.

2. Whether the murder of [each victim] was committed while the defendant was under the influence of extreme mental or emotional disturbance.

3. Whether the defendant was an accomplice in the murder of [each victim] and whether her participation was relatively minor.

4. Whether defendant acted under extreme duress or under substantial domination of another person.

5. The age of the defendant at the time of the offense.

You may also consider any circumstance which you find from the evidence in mitigation of punishment.

It is not necessary that all jurors agree on the existence of the same mitigating circumstance. If each juror finds one or more mitigating circumstance sufficient to outweigh the aggravating circumstances found to exist, then you must return a verdict fixing defendant's punishment at imprisonment for life by the Division of Corrections without eligibility of probation or parole.

Defendant now argues that the above instruction was constitutionally infirm in that it tells the jury it "may" consider mitigators rather than telling the jury it must consider mitigators and in doing so, allows a sentencer to refuse to consider relevant mitigating evidence.

Defendant ignores the plain words of the instruction. The first paragraph tells each juror that they "must" determine whether one or more mitigating circumstances exist that outweigh the aggravators found to exist. This is mandatory, not permissive, language. The same claim has been repeatedly rejected. *State v. Brown,* 902 S.W.2d 278, 299–300 (Mo. banc), *cert. denied* — U.S. ——, 116 S.Ct. 679, 133 L.Ed.2d 527 (1995); *State v. Parker,* 886 S.W.2d 908, 928–29 (Mo. banc), *cert. denied* — U.S. ——, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995).

■ Defendant next claims the trial court should have submitted additional mitigating circumstances as follows:

6. That Faye Copeland is a mother of six children, grandmother of twelve grandchildren, and great-grandmother of five great-grandchildren.

7. That Faye Copeland has been a loving and caring mother, grandmother and great-grandmother to her children, grandchildren and great-grandchildren.

8. That Faye Copeland has been a conscientious and diligent employee throughout her life.

9. That Faye Copeland has never before this been arrested or charged with a criminal offense.

Section 565.032.1(2) provides that the jury "shall not be instructed upon any specific evidence which may be in aggravation or mitigation of punishment, but shall be instructed that each juror may consider any evidence which he considers to be aggravating or mitigating." Even prior to enactment of this statute in 1993, this Court required that the trial court "not list any non-statutory mitigating circumstances in the instruction." *State v. Wacaser,* 794 S.W.2d 190, 195 (Mo. banc 1990). Because defendant was given an instruction including all the statutory mitigating circumstances to which she was entitled, as well as the catch-all paragraph covering essentially all of the nonstatutory mitigators which she sought to submit to the jury, the trial court committed no error.

## XVIII.

■ Finally, defendant challenges a submission of the instruction defining reasonable doubt as "a doubt based upon reason and common sense after a careful and impartial consideration of all the evidence." This argument has repeatedly been rejected and is again denied. *See State v. Debler,* 856 S.W.2d 641, 652 (Mo. banc 1993); *State v. Mease,* 842 S.W.2d 98, 112 (Mo. banc 1992); *cert. denied,* 508 U.S. 918, 113 S.Ct. 2363, 124 L.Ed.2d 269 (1993); *State v. Whitfield,* 837 S.W.2d 503, 511 (Mo. banc 1992).

## CONCLUSION

The judgments are affirmed.

All concur.