**STATE of Missouri, Respondent,**

v.

**Reginald CLEMONS, Appellant.**

No. 75833.

Supreme Court of Missouri,
En Banc.

May 27, 1997.

Rehearing Denied June 17, 1997.

John J. Kenney, David Massengill, Ian Yankwitt, New York City, Mark G. Arnold, St. Louis, for Appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Breck K. Burgess, Assistant Attorney General, Jefferson City, for Respondent.

ROBERTSON, Judge.

Because of his active participation in the drowning deaths of Julie and Robin Kerry, the jury found Reginald Clemons guilty of two counts of murder in the first degree and recommended the death sentence. The trial court imposed the death sentence. Appellant appeals from this verdict and sentence, as well as from the overruling of his timely-filed Rule 29.15 motion. We have jurisdiction, Mo. Const. article V, section 3, and affirm in all respects.

## I.

We review the facts in the light most favorable to the verdict. *State v. Copeland,* 928 S.W.2d 828, 834 (Mo.1996). The Chain of Rocks Bridge is a highway bridge over the Mississippi River that formerly permitted

traffic to travel between Illinois and Missouri before authorities closed the bridge to vehicular traffic. Julie and Robin Kerry arranged to take their visiting cousin, Thomas Cummins, to the bridge to show him a graffiti poem they had painted there several years earlier. On April 4, 1991, at approximately 11:25 p.m., the two sisters and Cummins went to the bridge.

Earlier that evening, appellant, Reginald Clemons, along with Marlin Gray, Daniel Winfrey, and appellant's cousin, Antonio Richardson, met at a mutual friend's home. They drank beer and smoked marijuana. Gray suggested that they go to the Chain of Rocks Bridge. About 11:00 p.m., appellant, Richardson, Gray and Winfrey drove in two separate cars to the bridge. Parking near the Missouri end of the bridge, the foursome went through a hole in a fence, over a pile of rocks blocking the bridge entrance to vehicles, and onto the bridge deck. They attempted to smoke a joint of marijuana, but found the marijuana too wet to light. The group walked back toward their cars. They left behind a long metal flashlight that Richardson had brought to the bridge.

The Kerry sisters and Cummins arrived at the bridge sometime after appellant and his friends. The Kerrys and Cummins made their way onto the bridge deck and walked toward the Illinois end of the bridge. They encountered appellant and his companions, who were headed back toward the Missouri side. The two groups chatted briefly. One of the Kerry sisters gave Winfrey a cigarette. Gray showed the Kerrys and Cummins how to climb over the bridge railing and come back up through a manhole in the bridge deck. He told Cummins that the manhole was "a good place to be alone, and take your woman." The two groups parted, heading in opposite directions. Cummins and the Kerry sisters stopped to look at the graffiti poem and then continued walking toward Illinois.

In the meantime, appellant and his friends had returned to the Missouri end of the bridge. As they lingered there, appellant suggested to his companions, "Let's rob them." Gray replied, "Yeah, I feel like hurting somebody." Richardson suggested they rape the girls. Appellant agreed. The foursome walked back toward the Illinois end of the bridge. As they walked, Winfrey saw Gray talk to appellant, after which Gray came to Winfrey and handed him a condom. Winfrey put the condom in his pocket and stated that he "wasn't going to do it." Appellant grabbed Winfrey, pushed him toward the rail of the bridge, and threatened him until Winfrey agreed to "do it."

The foursome caught up with the Kerry sisters and Cummins at the Illinois end of the bridge. Cummins and the Kerry sisters started back toward Missouri. The four men followed, then formed a cordon around their victims. Appellant and Richardson walked ahead of the Kerrys and Cummins. Gray and Winfrey walked behind.

After they passed the curve in the bridge, Gray grabbed Cummins by the arm, walked him back a short distance, and told him, "This is a robbery." Gray told Cummins to lie down on the ground. Cummins complied. Cummins heard the Kerry sisters scream for help as appellant and Richardson grabbed them. Appellant pushed one of the sisters toward Winfrey and ordered him to hold her. Gray told Cummins he would kill him if he looked. Cummins heard one of the assailants say to Julie, "You stupid bitch, do you want to die? I'll throw you off this bridge if you don't stop fighting."

While Winfrey restrained one of the Kerry sisters, Richardson held the other sister down. Appellant ripped the clothes from her and raped her. Richardson and appellant then traded places, and Richardson raped the woman. Gray then told Winfrey to watch Cummins, while Gray and appellant alternately raped the other Kerry sister. Appellant threw the women's clothes over the side of the bridge. Richardson took the first sister to a manhole further down the bridge toward Missouri and forced her to climb down to the metal platform below. Richardson followed her down the manhole.

When Gray finished raping the other Kerry sister, he asked where Richardson had gone. Winfrey said "he went down that way" and pointed toward the Missouri end of the bridge. Winfrey did not tell Gray that

Richardson had gone down the manhole. Gray headed down the bridge past the manhole.

In the meantime, appellant forced the other Kerry sister down the manhole with Richardson and the first sister. Appellant returned to Cummins, who was still lying on the ground, took his wallet, some money, a wristwatch, and some keys. When appellant discovered Cummins's firefighter badge in the wallet, he became concerned that Cummins might be a police officer. Appellant threw something—presumably the badge—off the bridge and put the wallet back in Cummins's pocket. Cummins heard appellant and Winfrey discuss whether Cummins should live or die. Someone told Cummins that he had never had the pleasure of "popping" someone. Appellant then yanked Cummins up by the coat collar, warned him not to look, and walked him to the manhole below which Richardson waited with the Kerry sisters. Appellant ordered Cummins to lie down on the bridge again and pulled his coat over his head. Cummins heard someone say, "You're going to die." Appellant then took Cummins and forced him into the manhole. As appellant started down the manhole, he asked Winfrey where Gray had gone and told Winfrey to "go get him." Winfrey left to find Gray.

On the metal platform under the bridge, Cummins laid down next to Julie and Robin Kerry. Either appellant or Richardson ordered them to get up and go to their left, to the concrete pier below the platform. As Robin Kerry stepped down, she grabbed Cummins's arm; either appellant or Richardson ordered them not to touch each other. When the three of them reached the pier, Julie, then Robin, were pushed off the bridge into the river below. Cummins was ordered to jump. He did. When Cummins surfaced after his seventy-foot fall, he saw Julie nearby in the water, and called for her to swim. Fighting the current and rough water, Julie grabbed Cummins, dragging them both below the surface. Cummins broke free. Julie did not reappear. Cummins eventually reached a steep riverbank and came ashore by a wooded area near the Chain of Rocks waterworks. Authorities recovered Julie's body from the river near Caruthersville, Missouri, about three weeks later. Robin's body is still missing.

Back on the bridge, Winfrey had walked all the way to the Missouri end of the bridge before he found Gray. He and Gray were returning to the bridge when they met appellant and Richardson. Appellant said, "Let's go, we threw them off." The four got into their cars and drove to a gas station, where they bought food, cigarettes and gas. They then drove to a place referred to as "The Rock," a cliff overlooking the river. The four climbed to the top, and as they sat, appellant and Gray remarked that the victims "would never make it to shore." Gray said that Richardson "was brave for doing that." Gray also told Winfrey that he "should have got some of the pussy." As they returned to their cars, appellant said, "Now if anybody said [sic] anything, I'm going to kill him."

Cummins called the police. In the course of their investigation of the bridge scene, police discovered the long flashlight that Richardson had left behind. The police traced the flashlight, which had been reported stolen, to Richardson and brought him in for questioning. Appellant's name surfaced during the interview with Richardson and, on April 7, 1991, detectives met appellant at his home. They asked him to accompany them to police headquarters to discuss the case. Appellant, who was not under arrest, freely accompanied the detectives. At police headquarters, appellant was informed of the constitutional rights protected by the warnings required under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), waived them, and consented to talk to the police. Appellant confessed to the rapes and admitted that the Kerry sisters and Cummins were forced from the bridge. After the interview, police arrested appellant.

## II.

### A.

### SUFFICIENCY OF THE EVIDENCE

Appellant argues that the trial court erred in submitting the charge of first degree murder to the jury. He claims there was no evidence from which the jury could find that

appellant deliberated prior to the murders of Julie and Robin Kerry.

■ When reviewing a challenge to the sufficiency of the evidence, the test is whether the state presented sufficient evidence that a reasonable juror could find the defendant guilty beyond a reasonable doubt. *State v. Brown*, 902 S.W.2d 278, 288 (Mo. banc 1995). Deliberation may be inferred from any circumstances that indicate "cool reflection for any length of time no matter how brief." *Id.* The evidence and inferences from the evidence are viewed in the light most favorable to the verdict. *State v. Storey*, 901 S.W.2d 886, 895 (Mo. banc 1995). Evidence and any inferences therefrom that do not support a finding of guilt are ignored. *State v. O'Brien*, 857 S.W.2d 212, 216 (Mo. banc 1993).

■ In cases of first-degree murder involving accomplice liability, the jury must find that the defendant himself deliberated. *Id.* at 217–218. While the act of homicide may be imputed to an accomplice, the element of deliberation may not be imputed by association. *Id.* Proof that a defendant merely aided another with the purpose of facilitating an intentional killing is not enough to prove first degree murder. *Id.* To make its case, the state must introduce evidence from which a reasonable juror could conclude beyond a reasonable doubt that the defendant (1) committed acts that aided his codefendant in killing the victims; (2) defendant's conscious purpose in committing the acts was that the victims be killed; *and* (3) defendant committed the acts after coolly deliberating on the victims' deaths for some amount of time, no matter how short. *Id.*

■ In *State v. Gray*, 887 S.W.2d 369 (Mo. banc 1994), a companion case, this Court addressed the question of accessory liability. In examining the evidence, the Court noted three circumstances that appear "highly relevant in determining if accomplice deliberation may be inferred." *Id.* at 376. The first circumstance is whether there is a statement or conduct by the defendant or by

a codefendant in the presence of defendant prior to the murder indicating a purpose to kill someone. *Id.* Another is evidence that the murder was committed by means of a deadly weapon and the accomplice was aware that the deadly weapon was to be used in the commission of the crime. *Id.* at 377. Finally, evidence of deliberation will be found where it appears that the defendant either participated in the homicide or continued in the criminal enterprise even after it became apparent that a victim was to be killed. *Id.*

■ In this case, there is ample evidence of statements or conduct by the defendant or in the defendant's presence indicating a purpose to kill. When the plan was first conceived, Marlin Gray announced that he "felt like hurting someone." While the rapes were *occurring*, someone—by inference either appellant or Antonio Richardson—said to Julie Kerry: "You stupid bitch, do you want to die? I'll throw you off the bridge if you don't stop fighting."[1] Appellant threw the sisters' clothes off of the bridge. After the rapes, first Richardson and then the appellant each put one of the Kerry sisters through the manhole to the platform below the bridge deck, from which the sisters were pushed to their deaths. Appellant then returned to the bridge deck where, after robbing Cummins, he discussed with Winfrey whether Cummins should live or die. Gray or Richardson could not have taken part in this discussion because Richardson was under the bridge and Gray had already started to walk off the bridge. Someone told Cummins that he had never had the pleasure of "popping" someone before. If appellant did not say this, it was said in his presence. Appellant then took Cummins and moved him next to the manhole, ordering him to lie down. Someone—either appellant or Winfrey—said, "You're going to die," after which appellant put Cummins into the manhole, before sending Winfrey to look for Gray and following Cummins through the manhole to the platform beneath the bridge himself. Once underneath the bridge, either appellant or Richardson pushed the Kerry sisters from

---

**1.** Even if appellant did not make the statement, it is reasonably inferred that it was made in his presence.

the bridge and ordered Cummins to jump into the river. Afterward, appellant bragged, "We threw them off."

Statements made by the defendant or in his presence indicated an intention to kill. Appellant continued to play an active role in the death-producing events, even after it became abundantly clear that the victims would be killed. The evidence of deliberation in this case is substantial, compelling, and without doubt. The trial court did not err in submitting the charges of first degree murder to the jury.

## B.

### PENALTY PHASE ARGUMENT

Appellant submits numerous allegations of improper argument by the prosecutor during the closing argument of the penalty phase proceedings. Only one of appellant's contentions was preserved for review on direct appeal.

 Appellant contends that the prosecutor, Nels Moss, made an improper reference to Charles Manson and John Wayne Gacy. Prior to closing arguments in the guilt phase, the Court had made the following ruling:

> [T]he prosecutor can't use any analogy involving Charles Manson, or raising any type of a horrible and well-known scenario and get the jurors thinking about it. I'm not saying you're going to compare it, but just get the jurors thinking about it.

However, despite that ruling, the prosecutor, during the penalty phase closing arguments, said the following:

> [The fact that Clemons] has no significant history of prior criminal activity, you know, the same can be said of John Wayne Gacy, Charles Manson, the fellow that killed the seven—

The trial court sustained the defense's objection to the prosecutor's statements, admonished the prosecutor to refrain from such argument, ordered the comments stricken from the record, and ordered the jury to disregard the comments. The trial court refused to declare a mistrial, however. Later, in a separate proceeding, the court found Moss guilty of criminal contempt for his deliberate violation of the court's order and fined him $500.

Appellant argues that the trial court's corrective measures were inadequate and that the deliberate misconduct on the part of the prosecutor warrants a reversal because the prosecutor's misconduct seriously affected the integrity or public reputation of the proceedings. *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936).

 The critical component of due process analysis in cases involving prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. *Smith v. Phillips,* 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982). Mistrial is a drastic remedy reserved for the most extraordinary circumstances. *State v. Johnson,* 901 S.W.2d 60, 62 (Mo. banc 1995). A decision whether to grant a mistrial is left to the sound discretion of the trial court. This rule recognizes that the trial court is in the best position to observe the impact of the problematic incident. *State v. Parker,* 886 S.W.2d 908, 922 (Mo. banc 1994). Review is for abuse of discretion. *Id.* Reversal is mandated where the failure to grant a mistrial resulted in a denial of a fair trial.

The trial court did not abuse its discretion in refusing to declare a mistrial in this case. In striking the statement from the record and ordering the jury not to consider it, the trial court took sufficient corrective measures to ameliorate any prejudice the prosecutor's statement created.

## C.

### CLEMONS'S CONFESSION

Appellant asserts that the trial court erred in refusing to suppress certain statements made by him because authorities obtained those statements in violation of his constitutional rights. In this regard, appellant claims that the police beat him in order to obtain a confession. He also contends that the police continued to interrogate him after he invoked his right to remain silent and his right to counsel. He argues that any statements he made to a family friend should also

218 ■

have been suppressed because that family friend was a police officer and the friend's questioning of appellant constituted a custodial interrogation.

■ In reviewing the trial court's ruling on a motion to suppress, this Court will sustain the trial court's determinations unless there is insufficient evidence to support the rulings. *State v. Rodriguez*, 877 S.W.2d 106, 110 (Mo. banc 1994). In reviewing the evidence, we consider all evidence and reasonable inferences in the light most favorable to the trial court's ruling. *Id.*

The facts show that about 6:00 p.m. on April 7, 1991, Officers Walsh and Brauer went to appellant's home and, finding him there, asked him if he would accompany them to police headquarters, as his name had surfaced in "the bridge case." Appellant agreed to accompany them. The officers did not handcuff nor arrest him, and appellant was free to leave.

Appellant arrived at police headquarters with the officers at about 6:30 p.m. The police advised him of the rights protected by the *Miranda* warnings. Appellant indicated that he understood those rights, did not want a lawyer, and was willing to talk to the police. A 45-minute interview ensued, followed by a 20-minute break, and then another interview which lasted between an hour and an hour and a half. At the conclusion of the second interview, the officers arrested appellant. Appellant agreed to make an audiotaped confession. Prior to the taped confession, police again advised appellant of his constitutional rights. Appellant waived those rights in writing again.

1.

Appellant claims the police beat him, rendering his confession involuntary.

■ At the suppression hearing, appellant testified that the police officers conducting the interrogation beat him about the head and chest and slammed his head against the wall. The detectives involved categori-

cally denied that any physical contact occurred. Appellant's initial attorney in this matter testified that he visited appellant in a holding cell at police headquarters the afternoon of April 8th, some 14 hours after appellant's interview had concluded, and observed that the right side of appellant's face was swollen. However, Warren Williams, a friend of appellant's family who is employed as a police officer, visited appellant at the request of appellant's mother and saw appellant literally minutes before appellant's attorney arrived. Williams testified that he did *not* observe any sign of injury. The next day, April 9, at appellant's arraignment, the presiding judge ordered that appellant be examined at the emergency room at the Regional Hospital. According to the hospital records, appellant was diagnosed with myalgia,[2] mild myositis,[3] and a swollen right cheek.

Viewing this evidence in the light most favorable to the trial court's ruling, we find sufficient evidence to support the trial court's finding that appellant's confession was voluntary. The trial court had the opportunity to judge the credibility of the witnesses and obviously found the state's witnesses' testimony more credible than appellant's. While there was additional testimony from appellant's family that appellant's face was swollen, all of these observations were made some 48 hours or more after appellant's interview and confession. The evidence, including the hospital records, simply does not demonstrate either when or how appellant incurred any injury. Nor does it establish that an injury actually occurred at the hands of the police officers conducting his interview. Appellant failed to meet his burden. We find no abuse of discretion in failing to suppress appellant's confession on these grounds.

2.

■ Appellant also claims that the trial court should have suppressed his statements because police officers ignored his invocation of his right to remain silent and his right to

2. "Myalgia" is defined as pain in one or more muscles. Blakiston's New Gould Medical Dictionary (1956).

3. "Myositis" is inflammation of the muscles. Blakiston's New Gould Medical Dictionary (1956).

counsel.[4] This alleged assertion took place at the beginning of appellant's audiotaped confession. Appellant claims that the taped statement demonstrates that the police violated the rule announced in *Miranda*.

The audiotaped statement begins with the police reading each *Miranda* warning and asking appellant whether he understands that right. Appellant states that he does. Detective Pappas then asks:

Q. Okay. At this time, Reginald ... do you wish to waive these constitutional rights and make a statement concerning what happened on the night of April 5th, 1991, on ... the Chain of Rocks Bridge?

A. No, sir.

Appellant cites language in *Miranda* that states that questioning must cease if the suspect "indicates in any manner and at any state of the process that he wishes to consult with an attorney before speaking." 384 U.S. at 444–445, 86 S.Ct. at 1612. Appellant maintains that when he said, "No, sir," in response to the officer's question, he asserted his intention not to waive his constitutional rights and that the interview should have stopped at once. Instead, the police continued questioning as follows:

Q. Okay, you do—you don't want to make a statement at this time?

A. I don't want to use the rights.

Q. In other words ... you're waiving your rights to make a statement.... Is that right?

A. Yes.

Q. Okay. So you're waiving your constitutional rights?

A. Okay, sir.

DET. BRAUER: ... [W]hat it means is that you give up those rights and that you want to talk about the incident. Is that

what you want to do? Tell us about the incident?

A. Yes, sir.

DET. BRAUER: Okay. That's what we mean. That's what it means to waive your rights.

DET. PAPPAS: All that means is that you want to waive these rights at this time to make ... an audio taped statement. That's what we're talking about. Okay. Do you still understand what we're saying? I don't want you to be confused about this.

A. Yes. I want to tell everything that happened up on the bridge.

Q. Okay. So you're wishing to make a statement?

A. Yes.

Despite appellant's hopeful, contrary claim, the transcript clearly shows that appellant affirmatively waived his rights and agreed to make an audio-taped statement. Undaunted, appellant contends that the dialogue clarifying his intent should not be considered at all, in that his initial response—"No, sir"—was an unequivocal statement of his intent to exercise his rights. Thus, the police should immediately have ceased any questioning of any type.

■ We disagree. Unlike appellant, we do not read *Miranda* searching for out-of-context sentences that support a preferred outcome. Honestly read, *Miranda* contemplates situations in which there may be some question as to whether a defendant wishes to assert his rights or not. In such instances, the interviewer may clarify the defendant's intent by continued questioning as to whether or not the defendant does or does not waive his rights. *Miranda v. Arizona,* 384 U.S. 436, 485, 86 S.Ct. 1602, 1633–1634, 16 L.Ed.2d 694 (citing with approval Federal Bureau of Investigation procedures for con-

---

**4.** Appellant does not dispute that he received the *Miranda* warnings. For reasons that are not clear to us, both the state and appellant argue as to whether appellant was "in custody" when he was brought to police headquarters. The detectives testified that appellant was free to leave at any time up until the point where they placed him under arrest after the interview. Appellant claims that a reasonable person in his position would not have thought he was free to leave.

Whether appellant was in custody or not when the initial interview began is irrelevant because the detectives read appellant his *Miranda* warnings prior to the interview and he stated that he was waiving those rights and was willing to talk to the police. Thus, even if appellant was "in custody" when the initial interview began, he had been read the *Miranda* warnings and he waived his rights.

duct of custodial interviews with respect to subject's constitutional rights).

In light of the fact that appellant had been freely speaking with the police for the past two hours, had already confessed, and had agreed to make a tape-recorded statement before the detectives began to record the confession, we find that appellant's response was not an unequivocal assertion of his rights but rather an ambiguous, equivocal statement of his intent that required clarification. The detectives did not violate appellant's constitutional rights by asking questions to clarify his intentions. His intentions, as reflected by the entire conversation, were to waive his rights and make a statement.

The trial court did not abuse its discretion in failing to suppress the taped confession.

### 3.

■ Finally, appellant contends that the trial court erred in refusing to suppress statements he made to Warren Williams because appellant made those statements during a custodial interrogation and appellant had not waived his Fifth and Sixth Amendment rights.

Appellant's mother, Vera Thomas, grew concerned when she heard nothing from appellant after he left with the homicide detectives early in the evening of April 7th. Thomas called a friend of the family, Warren Williams, a police officer who was once married to Thomas's cousin, and asked him to try to discover what had happened to appellant. Williams made a few phone calls and found that appellant was in the men's holdover at police headquarters. Williams, who had known appellant since appellant's birth, visited appellant at the holdover on the afternoon of April 8th. During the course of this visit, appellant told Williams that he had gotten mixed up with the wrong people, and that they had gotten drunk and raped two girls. Appellant said that one of the other boys pushed the girls into the river, out of concern that the girls might later identify him.

Appellant now contends that the trial court should have suppressed this statement as the fruit of a custodial interrogation before which he had not waived his Fifth and Sixth

Amendment rights. Appellant observes that he was in custody, that Williams was a police officer (although dressed in plain clothes at the time), and that appellant knew that Williams was a police officer. The state, on the other hand, counters that Williams acted as a concerned friend of the family, not in his official capacity as a police officer, when he met with appellant that afternoon. Furthermore, appellant had previously received the *Miranda* warnings and had waived his rights at that time. Even if Williams were acting as a police officer, the state contends, it was unnecessary for him to read appellant the *Miranda* warnings again.

■ *Miranda* warnings are not so ephemeral that they evaporate between questionings. Once received, and the constitutional rights they protect waived, the waiver remains in effect until undone by the person in custody. The point is denied.

### 4.

On a related point, appellant also alleges that his counsel ineffectively presented his suppression motion to the trial court. Appellant judges the motion itself insufficient and counsel's representation deficient in failing to call three witnesses to testify at the suppression hearing.

■ Appellant first charges that his counsel failed him in neglecting to cite what he characterizes as "controlling precedent" in the motion to suppress filed with the trial court. This "controlling precedent"—apparently *Miranda* (appellant never specifies)—allegedly establishes that once appellant said "no," all questioning had to cease. As we have said, appellant overlooks the further teachings of *Miranda* that allow continued questioning in an effort to clarify a suspect's intent when that intent is not clear. For the reasons previously stated, appellant's argument on the merits is incorrect. The motion court properly did not fault counsel for failing to argue a legally-insufficient point more vociferously.

■ Appellant next contends that his counsel's failure to call Dr. Reynal Caldwell, Cedric Richardson, and Marie Hicks to testify about appellant's facial injuries at the

suppression hearing was ineffective. To support a claim of ineffective assistance, appellant must show that the witnesses would have testified if called and that testimony would have aided appellant's defense. *State v. Johnson*, 901 S.W.2d 60, 63 (Mo.1995). As the following discussion shows, the testimony of none of these witnesses would have made any difference in the outcome of the suppression hearing.

■ At the Rule 29.15 hearing, Dr. Caldwell testified that it appeared appellant had been injured in that there was apparent swelling in the facial area. This testimony was based upon his review of hospital records and photographs of the appellant, not on actual examination of the appellant. Dr. Caldwell testified that he could not offer an opinion as to how or when the injuries occurred. His testimony would have added nothing to the evidence already presented at the suppression hearing. Appellant cannot be prejudiced by a failure to present cumulative testimony. *See, e.g. State v. Kinder*, 942 S.W.2d 313, 336 (Mo. banc 1996).

■ Cedric Richardson is a personal friend of appellant and the brother of Antonio Richardson, one of appellant's codefendants. The motion court, in its findings of fact, found that his testimony was not credible, in large part due to these relationships. Our review of his testimony leads to a similar conclusion. The testimony is grossly inconsistent with that of other parties. For example, Richardson testified that he was in the car with police when they arrived at appellant's house; that the appellant came outside to talk to the police; that while the police were talking to him, appellant's mother arrived home; and that Richardson accompanied appellant and the officers to police headquarters. This testimony is completely at odds with testimony of appellant's mother on this point. Other testimony indicated that no one was in the car with the police when they arrived at appellant's home; that appellant's mother let the police into the house; that the detectives encountered appellant only after they entered the house; and that appellant rode alone in the back seat of the detectives' car when they left for the police station.

Finally, appellant avers in his brief that Marie Hicks would have testified that she observed swelling on appellant's face "at the end of the 48 hour period." Ms. Hicks served as an intake officer at the St. Louis County jail. First, the "48 hour period" is not sufficiently described to know the 48 hours to which appellant refers. Assuming that the 48-hour period began when appellant arrived at the police station that Sunday night, Hicks' testimony cannot establish exactly how or when appellant received his injury. Her testimony would have been cumulative, at best.

The motion court did not err in overruling the Rule 29.15 motion on this point.

### D.

### 1.

### FUNDS FOR MENTAL HEALTH EXPERTS

■ Appellant claims error on the part of the trial court in denying his request for funds to provide for expert testimony on his mental state. He maintains that his mental condition was crucially relevant to his criminal culpability and the punishment he faced. He cites *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), for the proposition that due process requires that he be allowed access to expert witnesses.

*Ake* says:

"A defendant's mental condition is not necessarily at issue in every criminal proceeding ... and it is unlikely that psychiatric assistance ... would be of probable value in cases where it is not. The risk of error from denial of such assistance, as well as its probable value, is most predictably at its height *when the defendant's mental condition is seriously in question.* ... [W]hen a defendant demonstrates to the trial judge that *his sanity at the time of the offense is to be a significant factor* at trial, the State must, at a minimum assure access to a competent psychiatrist....."

(Emphasis added.) 470 U.S. at 82–83, 105 S.Ct. at 1096.

Appellant claims he met the *Ake* "seriously-in-question" standard by filing a notice of intent to raise diminished capacity and a

notice of mitigating circumstances. However, these bare notices, without more, are insufficient to show the trial court that appellant's mental condition would, in fact, be a significant factor at trial.

 Any defendant can make a bald statement of diminished capacity or claim that he acted under extreme mental duress. The State is not required to provide expert psychiatric assistance based on unsupported allegations, however. To qualify under *Ake,* a defendant must allege facts, not state mere legal conclusions or theories, to show the trial court that his or her mental condition is relevant to the issues before the trial court.

 Appellant states that his pretrial motion seeking funds and the suggestions in support thereof demonstrate the relevancy of his mental condition. Appellant's motion states:

> Missouri law makes Reginald Clemons's mental condition relevant to criminal responsibility and sentencing in many significant ways: (a) competency at trial and sentencing; (b) specific intent to commit first degree murder; (c) legal insanity or diminished capacity; (d) competencies to waive his rights, including the right not to incriminate himself and to waive counsel; (e) mental health issues as they relate to mitigation of sentence.

This survey of the ways in which a mental condition may be relevant in some criminal cases does not demonstrate any reason for the trial court to find that appellant's actual mental condition was, in fact, seriously at issue in this case. Appellant's motion does not assert a fact-based claim that he was legally insane at the time of the crime, or that he was incompetent to stand trial, or that he was incapable of forming the specific intent to commit the crime.

 The only "facts" appellant alleges in his motion and attached affidavits regarding his mental condition are that he suffers from learning disabilities and attention deficit hyperactivity disorder (ADHD) and speculation that he "might" have a neurological defect. The mere allegation of any abnormal mental condition is not enough to cross the *Ake* threshold; not every mental abnormality is relevant to a defendant's mental state for the purposes of criminal culpability. In addition, mere speculation as to a mental defect, without alleging any basis to support the speculation, is insufficient to raise the issue under *Ake.* Appellant's allegations and speculations do not rise to the level of significance necessary to cross the *Ake* threshold; they do not put the defendant's mental state "seriously in question" or render it likely to be a "significant factor" at trial.

 Appellant also filed a motion requesting an order to allow a particular psychologist to examine him regarding diminished capacity and death penalty issues. He claims he needed such an investigation because there would be an issue at trial "as to who was the leader and who were the followers, whether defendant understood the *Miranda* warnings, (and) whether defendant understood the consequences of his actions including the criminality of his acts." The motion fails, likewise, to allege any facts to suggest that these questions were seriously in issue or from which the court might infer a genuine possibility that appellant did not or could not understand the criminality of his acts. We repeat: A mere allegation that a defendant's mental capacity is at issue does not make it so. Facts supporting the allegation are necessary to show the seriousness of the allegation and its relevancy to the issues before the trial court.

Appellant's case, therefore, is entirely different from those he cites in support of his claim. In *Ake,* the defendant's behavior was so bizarre that the trial judge *sua sponte* ordered a mental examination, which revealed the defendant to be a paranoid schizophrenic. In *Starr v. Lockhart,* 23 F.3d 1280 (8th Cir.1994), the defendant presented the court with mental health records demonstrating a diagnosis of mild to moderate retardation. In *Kenley v. Armontrout,* 937 F.2d 1298 (8th Cir.1991), records showed defendant's history of suicide attempts, various diagnoses of possible mental problems throughout his life, abnormal EEG's, and records of treatment dating back some 13 years before the crimes in question occurred.

■ In each of these cases, the defendant offered a factual basis to demonstrate a significant concern about the defendant's mental condition as it related to the crime. Such a factual basis is wholly absent in this case. Claims of learning disabilities and ADHD are not mental conditions that, of themselves, are so consequential as to become a significant factor where the issue is appellant's mental condition as it relates to his criminal culpability.

We conclude that appellant did not put his mental state *seriously* at issue or provide any factual support for a claim that it might reasonably become a *significant* factor at trial. The trial court did not abuse its discretion in failing to grant appellant's motion requesting funds for mental experts.

■ Alternatively, appellant charges that the State made his mental state an issue, thus triggering his rights under *Ake*. *Ake* states that "when the State has made the defendant's mental condition relevant to his criminal culpability and to the punishment he might suffer, the assistance of a psychiatrist may well be crucial to the defendant's ability to marshal his defense." 470 U.S. at 80, 105 S.Ct. at 1095. Appellant claims that the state made appellant's mental state an issue when it submitted the depravity of mind aggravator.

A superficial glance at the jury instructions demonstrates that "depravity of mind" is not based upon a psychiatric evaluation of a defendant's mental state, but rather is evidenced by the horrible nature of the circumstances of the homicide. *See, e.g.,* MAI–Cr3d 313.40 (Notes on Use 7).[5] The State need not put on psychiatric testimony to prove depravity of mind (and in fact, did not put on any such testimony in this case) and the defense has no need of psychiatric expert testimony to refute it. The use of the depravity of mind aggravator does not put the defendant's mental condition at issue.

**2.**

■ In a related claim, appellant finds his counsel ineffective in the penalty phase for failing to call mental health experts to testify. Appellant contends that counsel's decision not to call these witnesses was not an informed, strategic decision because counsel failed adequately to investigate possible mitigating circumstances to present at penalty phase.

■ Counsel's presentation of penalty phase evidence is a matter of professional judgment. *Antwine v. State,* 791 S.W.2d 403, 407 (Mo. banc 1990). No duty exists in counsel to present mitigating character evidence at penalty phase. *Clemmons v. State,* 785 S.W.2d 524, 528 (Mo. banc 1990). Defense counsel is under no obligation to present the defendant's background in mitigation in a death penalty case. *Schneider v. State,* 787 S.W.2d 718, 721 (Mo. banc 1990).

Defense counsel hired Maryann Marxhors to investigate appellant's background to determine whether psychiatric evidence would avail defendant in either the guilt or penalty phase. Armed with appellant's school and medical records, counsel consulted with a psychiatrist in California to see whether he might help defendant's case. This psychiatrist indicated that he would be "crucified" on cross-examination, due to material in the records which suggested that appellant was aggressive. On the basis of this investigation, counsel chose not to put on any psychiatric evidence.

Appellant insists that counsels' decision was not strategic because it was not well-informed. The record shows otherwise. Counsel did attempt to investigate as to whether any substantive claims existed relating to a mental defect or diminished capacity in appellant. Counsel ultimately determined that the adverse inferences from such evidence, as well as potential rebuttal evidence brought out in cross-examination by the prosecution, outweighed the potential good such evidence might have produced. This

5. Depravity of mind will be found, for example, if the jury finds that the defendant inflicted physical pain or emotional suffering on the victim for the purpose of making the victim suffer before dying; if the defendant committed repeated and excessive acts of physical abuse upon the victim; if the victim was bound or otherwise rendered helpless; if the victim was physically disabled; if the defendant purposely mutilated or grossly disfigured the body, etc.

was an informed, strategic choice that is not subject to the judgment of hindsight. *Cheek v. State*, 459 S.W.2d 278, 281 (Mo.1970).

Moreover, as we observed above, we have reviewed the testimony of appellant's experts at the Rule 29.15 hearing and found that the testimony was not such that it made it probable that the outcome of the penalty phase would have been different. Appellant's point is denied.

## III.

Appellant raises numerous claims of trial court error on direct appeal that were not properly preserved because they were either not objected to at trial or not raised in the motion for new trial. These claims are reviewable, if at all, only for plain error. *State v. Ervin*, 835 S.W.2d 905 (Mo. banc 1992). Rule 30.20. The "plain error" rule is to be used sparingly and may not be used to justify a review of every point that has not been otherwise preserved for appellate review. *Ervin*, 835 S.W.2d at 920. Appellant must demonstrate that manifest injustice or a miscarriage of justice will occur if the error is not corrected. *State v. Parker*, 856 S.W.2d 331, 333 (Mo. banc 1993).

In *State v. Brown*, 902 S.W.2d 278, 284 (Mo. banc 1995), this Court said:

[U]nless a claim of plain error facially establishes substantial grounds for believing that "manifest injustice or miscarriage of justice has resulted," this Court will decline to exercise its discretion to review for plain error under Rule 30.20. We will, however, consider related claims of ineffective assistance of counsel for failure to preserve the alleged trial error under the test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

None of appellant's unpreserved claims raise a substantial ground for finding plain error. Therefore, we decline to subject these claims to our discretionary review under Rule 30.20. However, to the extent appellant properly raises the issue under Rule 29.15, we will review appellant's additional claims for ineffective assistance of counsel, either for failure to preserve the alleged trial error or for

ineffective assistance regarding the circumstances of the trial error itself.

### A.

### JURY SELECTION

Appellant insists he received ineffective assistance of counsel when defense counsel failed to "[p]revent the prosecutor from using improper questions during voir dire." This failure led the trial court to exclude six venirepersons for cause on the issue of death qualification. A ruling on a challenge for cause must be based on the whole record. *See State v. Kinder*, 942 S.W.2d 313, 324 (Mo. banc 1996).

The trial court struck venirepersons Passalacqua, Sanders, Elrod, Stewart, Jones, and Munsell for cause because they expressed an inability to consider the death penalty for an accomplice who did not commit the act that led directly to the victims' deaths.

During the death qualification portion of voir dire, the prosecutor explained the concept of accomplice liability, at times using hypotheticals for this purpose. He asked prospective jurors whether they would be able to sentence an accomplice to death where the evidence did not show that the accomplice committed the act that directly caused the victims' deaths. Appellant charges that the prosecutor's hypotheticals misled the members of the venire because the hypotheticals dealt with an accomplice to robbery, rather than first degree murder, and because the prosecutor's explanations did not make clear that the accomplice also had to have the requisite intent to commit the crime.

The nature and extent of questioning on voir dire is within the discretion of the trial judge. Only a manifest abuse of discretion and a probability of prejudice to the defendant will justify reversal. *State v. Storey*, 901 S.W.2d 886, 892 (Mo.1995).

In *State v. Seddens*, 878 S.W.2d 89 (Mo. App.1994), the defendant, who was convicted of first degree murder, argued that the prosecutor's use of hypotheticals during voir dire led the jury to "an erroneous definition of

accessorial liability." *Id.* at 92. The court noted that the jury ultimately received the approved instruction on accessorial liability, a modified version of MAI–CR3d 304.04:

A person is responsible for his own conduct and he is also responsible for the conduct of another person in committing an offense if he acts with him with the common purpose of committing that offense, or if, for the purpose of committing that offense, he aids or encourages the other person in committing it.

The *Seddens* court found that the prosecutor's hypotheticals did not diverge from the instruction and, thus, no abuse of trial court discretion occurred. In the present case, the jury received an identical instruction. We have reviewed the prosecutor's hypotheticals. They do not deviate from the language of the approved instruction and did not misstate the basic concept of accessory liability.

■■■ Appellant, however, relies on the Notes on Use to MAI–CR3d 304.04 for the proposition that for a jury to find an accomplice guilty of murder, the jury must find that the accomplice had the requisite intent. A first degree murder conviction requires the jury to find that an accomplice defendant deliberated. It is not necessary, however, for the prosecutor to make reference to the elements of first degree murder during death qualification of the jury. This is because the element of deliberation for the purpose of accomplice liability for first degree murder is relevant to a finding of guilt or innocence, not punishment.

■■■ Death qualification focuses on an entirely different issue. Death qualification attempts to determine whether a potential juror could consider the full range of punishment *if* the defendant is found guilty of first degree murder. Thus, when the prosecutor asks a potential juror whether he or she could recommend the death penalty for an accomplice, the assumption—solely for the sake of asking and answering the punishment question—is that the jury has already found the defendant guilty of all of the elements of first degree murder, including deliberation, beyond a reasonable doubt. For this reason, deliberation is not an issue when a venireperson considers whether or not he or she could

impose the death penalty. The motion court did not err in holding that trial counsel was not ineffective in failing to preserve this non-error.

■■■ Appellant also claims that the trial court erred in striking venireman Doss for cause because Doss intimated that he could vote for the death penalty in an accomplice case. Doss initially indicated that he could not vote for the death penalty at all. Under further voir dire questioning by the prosecutor, Doss said he might be able to vote for death under certain circumstances. Doss then equivocated, saying that he still would not be able to vote for the death penalty if appellant were only guilty as an accomplice and did not actually push the girls off of the bridge. After further questioning by the prosecutor, Doss said the prosecutor might be able to show him something that would allow him to consider the death penalty even if appellant did not do the actual pushing. The trial court ultimately sustained the State's motion to strike Doss.

■■■ While a trial court cannot exclude a juror from a capital punishment case simply because of a conscientious objection to the death penalty, a juror may be excluded if his views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). The trial court has broad discretion in determining whether a prospective juror is "death qualified," as the trial judge is in a superior position to evaluate the demeanor and testimony of the prospective jurors. *State v. McMillin,* 783 S.W.2d 82, 93 (Mo. 1990).

Doss's equivocal and shifting responses to questions focusing on his ability to impose the death penalty provide a sufficient rationale for the trial court's decision to sustain the state's motion. In light of Doss's conflicting testimony, the trial court did abuse its discretion in striking Doss for cause. The motion court did not err in holding counsel not ineffective on this issue.

## B.

### PENALTY PHASE WITNESSES

■ Appellant submits that his counsel was ineffective at the penalty phase for failing to call certain witnesses. These witnesses would have testified as to appellant's alleged personality disorders and learning disabilities, as well as his passive, non-violent nature. Appellant contends that counsels' decision not to call these witnesses cannot be considered an informed, strategic decision because counsel failed adequately to investigate possible mitigating circumstances to present at penalty phase.

We have previously addressed and rejected appellant's claim of ineffective assistance regarding counsels' failure to offer expert mental health witnesses. In addition to psychological experts, however, appellant argues that counsel was constitutionally ineffective for failing to call lay witnesses who could have testified as to appellant's non-violent personality, as well as other circumstances of appellant's life that would have warranted the jury recommending a life sentence instead of the death penalty. In his brief, however, appellant only identifies one of these lay witnesses, Robbie Asbridge. Asbridge was involved in an altercation with appellant while both were confined in the city jail.

During the penalty phase, Dave Kovak, a social worker and supervisor at the city jail, testified that appellant received discipline for two violations while in the city jail, as a result of fighting with other residents and inflicting bodily harm. Asbridge was the other pugilant in one of these altercations, and appellant argues that Asbridge would have testified that it was he, not appellant, who initiated the fight for which appellant was ultimately disciplined.

Appellant's trial counsel testified that he declined to call Asbridge because he did not find his testimony helpful. At the Rule 29.15 hearing, Asbridge testified that he started the fight with appellant by bumping into him, and that he told investigators he suffered his injury when he fell in the shower. However, Delores Elam, a lieutenant at the city jail at the time of the incident, also testified at the Rule 29.15 hearing. She indicated that she took a statement from Asbridge, who said that appellant had hit him, and that Asbridge was hospitalized with a broken jaw.

The record reveals that Asbridge's testimony at the Rule 29.15 hearing lacked credibility. Moreover, even if Asbridge could be believed, his testimony would have absolved appellant from but one of the fights for which he received discipline. The motion court determined counsel was not ineffective in failing to call Asbridge. The motion court did not err in this finding.

## C.

### USE OF RICHARDSON'S OUT OF COURT STATEMENTS

■ Appellant contends that his counsel was ineffective in failing to preserve objections to trial testimony regarding the confession of codefendant Antonio Richardson. Appellant argues that the testimony concerning Richardson's confession was hearsay and, under the standards of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), that testimony should not have been allowed into evidence because it violated the Sixth Amendment's Confrontation Clause. Defense counsel objected vociferously to any mention of Richardson's statement, but these objections were overruled. Counsel did not preserve them by including them in appellant's motion for new trial.

In *Bruton,* the Court held that admission of a codefendant's confession implicating the defendant, where the codefendant does not testify, violates a defendant's rights under the Confrontation Clause to cross-examine witnesses. 391 U.S. at 126, 88 S.Ct. at 1622–1623.

While evidence in the record showed that Richardson made a statement, the precise contents of that statement did not come into evidence through any act of the prosecution. The jury did not hear a recording of Richardson's statement nor did they read a transcript of it. The prosecutor did not elicit direct testimony from any witness as to any details of what Richardson said in his statement. In short, the state did not elicit any direct testimony to the effect that Richard-

son's statement explicitly implicated appellant.

Rather, the defense elicited the most direct testimony to that effect. During the presentation of appellant's case, the defense asked Detective Chris Pappas: "And what Mr. Antonio Richardson said didn't implicate [Clemons]?" Pappas responded, "Yes, sir; it did implicate." Although this is clearly testimony regarding an out-of-court statement of Richardson that implicated the appellant, there is no *Bruton* violation where the defendant elicits the incriminating out-of-court statements. *United States v. Karam,* 37 F.3d 1280, 1287 (8th Cir.1994).

Appellant ignores the above testimony in his brief, but rather concentrates on the prosecutor's alleged "end run" around the *Bruton* rule. Appellant charges that the prosecutor first elicited testimony that Cummins had made a statement implicating appellant, and then asked police officers whether Richardson's statements were consistent with those of Cummins. Thus, to the extent Cummins's recorded statements to the police implicated appellant, the jury could infer that Richardson's did as well.

The state contends such testimony was not hearsay because it was not offered for the truth of the matter asserted but rather to explain why the police turned their investigation away from Cummins. Appellant disagrees. He claims the testimony about Richardson's statement was offered solely to bolster Cummins's own statement and, thus, was offered for the truth of the matter asserted, rendering it hearsay.

We need not decide whether this indirect testimony as to the substance of Richardson's out-of-court statement is inadmissible because we do not see how appellant was prejudiced by the testimony. Even an obvious violation of *Bruton* does not mean automatic reversal. *Schneble v. Florida,* 405 U.S. 427, 430, 92 S.Ct. 1056, 1058–1059, 31 L.Ed.2d 340 (1972). Where the evidence of guilt is overwhelming and the prejudicial effect of the codefendant's statement is insignificant by comparison, the admission of the statement is but harmless error. *Id.* Reversal is not required unless there is a reason-

able probability that the improperly admitted evidence contributed to the conviction. *Id.* at 431, 92 S.Ct. at 1059.

The cross-examination testimony elicited by the prosecution regarding Richardson's statement, even if improper, was not so prejudicial as to warrant reversal. First, as noted above, defendant himself elicited the most direct testimony as to the content of Richardson's out-of-court statement. Second, there is no reason to conclude that references to Richardson's statements formed the essential foundation on which the jury built its verdict. This is because appellant's own statement admitted that appellant was on the platform underneath the bridge when Julie and Robin Kerry were pushed to their deaths.

Appellant maintains that any prejudicial effect was magnified, however, by the fact that the prosecution played a videotape, without sound, of Richardson walking along the bridge and pointing out various locations on the bridge to investigators. The trial court viewed the videotape prior to showing it to the jury, determined that there was no nonverbal statement by Richardson on the tape, and that the prejudice, if any, to appellant of Richardson's presence on the tape was outweighed by the probative value of giving the jury a visual layout of the crime scene.

In light of the strong case against appellant, the indirect nature of the prosecution's reference to the substance of Richardson's statement, and the fact that the only direct reference to the contents of Richardson's statement was elicited by the defense, we conclude that the motion court did not err in failing to find ineffective assistance of counsel for failure to raise the claim in the motion for new trial.

### D.

### ALLEGED IMPROPER ARGUMENT AT GUILT PHASE

Appellant raises numerous claims of improper closing argument by the prosecutor during the guilt phase of trial, believing his counsel ineffective in failing to object. The motion court found no ineffective assistance; we will reverse the motion court's

findings only if they are clearly erroneous. *State v. Copeland,* 928 S.W.2d 828, 844 (Mo. 1996). Counsel is not ineffective for failing to make non-meritorious objections. *State v. Kreutzer,* 928 S.W.2d 854, 876 (Mo. banc 1996). Thus, appellant must show that counsel's objection would have been upheld if made and that the failure to object resulted in a substantial deprivation of his right to a fair trial. *Ruff v. State,* 815 S.W.2d 460, 465 (Mo.App.1991). Generally, failure to object during closing argument is not error, but rather a function of trial strategy. *State v. Wood,* 719 S.W.2d 756, 759–60 (Mo.1986).

### 1.

■ Appellant first claims ineffective assistance because defense counsel failed to object when the prosecutor said:

> Now, here's the point. The evidence here is absolutely positive, without a doubt, overwhelming, overwhelming at this point. You know, that you have seen it all. So that presumption, I submit to you is dispelled.

Appellant claims this argument tells the jury to ignore the presumption of innocence. Read in context, the prosecutor's statement merely argues that the State has met its burden of proof and has overcome the presumption of innocence. The prosecutor did not tell the jury to ignore that presumption. The state's argument was not improper. The point is denied.

### 2.

■ Appellant faults counsel for failing to object to the prosecutor's allegedly impermissible references to appellant's failure to testify. The prosecutor did comment several times that the evidence against appellant was undisputed or uncontradicted. Merely stating that the evidence is uncontradicted is not a direct reference to a defendant's failure to testify. *State v. Lee,* 841 S.W.2d 648 (Mo. banc 1992).

■ Appellant contends that there was an indirect reference to his failure to testify in that the evidence the prosecutor labeled as "undisputed" could only have been contradicted by appellant. When the accused is the only witness that can deny the evidence

on a vital portion of the case, a general statement that such proof was undisputed has been held to be an indirect reference to the defendant's failure to testify. *State v. Arnold,* 628 S.W.2d 665, 669 (Mo.1982). An indirect reference to a defendant's failure to testify is improper only where the prosecutor proceeds from a calculated intent to magnify the defendant's decision not to testify so as to call it to the jury's attention to that silence. *State v. Lawhorn,* 762 S.W.2d 820, 826 (Mo.banc 1988).

On review of the record, we believe that the motion court did not err on this point. This case does not present a situation where only the defendant could dispute the state's evidence. The point is denied.

### 3.

■ Appellant next contends that his counsel was ineffective in failing to object when the prosecutor said:

> And you must understand we can only—the law says we use Mr. Clemons' statement here. What anybody else said involved in this thing is not relevant and we can't bring it in.

Appellant contends this statement suggests that the prosecutor had additional incriminating evidence that he was simply unable to present to the jury. The prosecutor may make statements drawing legitimate inferences from the evidence, but he may not make statements that imply a knowledge of facts not before the jury. *State v. Whitfield,* 837 S.W.2d 503, 511 (Mo. banc 1992). Contrary to appellant's assertion, the prosecutor is directing the jury not to speculate as to evidence outside of the record. The appellant is not prejudiced when the prosecutor explicitly states that any statements not in the record are *not* relevant to the case. The motion court did not err when it held that defense counsel was not ineffective for failing to object to this statement.

### 4.

■ Next in appellant's litany is his contention that his counsel failed to object when the prosecutor injected his own opinion as to appellant's guilt into his closing argument.

The prosecutor referred to some of the defense's theories as "preposterous" and "in my opinion, probably ... pretty stupid." Appellant also claims counsel should have objected to such statements as: "If you listened to the evidence correctly, you saw what was going on here" and "to find Mr. Clemons not guilty is to leave every last ounce of common sense and reason you were ever born with on the doorstep of the courtroom."

Prosecutors may make reasonable inferences from the evidence. *State v. Weaver*, 912 S.W.2d 499, 512 (Mo. banc 1995). Prosecutors may make statements that indicate their opinion of the defendant's guilt, where it is apparent that the opinion is based on evidence in the case. *Id.* Prosecutors may also comment on the evidence and the credibility of witnesses, even to the point of belittling and or discussing the improbability of specific testimony. *Id.* at 513.

The prosecutor's statements here, read in context, do not impermissibly express the prosecutor's opinion. They are permissible arguments as to the strength of the case based on evidence in the record. The motion court did not err in failing to find counsel ineffective for failing to object to these statements.

### 5.

Appellant claims he suffered unconstitutional prejudice because his counsel did not object when the prosecutor told the jury that "there are people willing to do things to put that kind of evidence on that's obviously a lie." Appellant characterizes this statement as a personal attack on his defense counsel.

As we have said, a prosecutor may comment on the evidence and the credibility of witnesses, even to the point of belittling or highlighting the improbability of specific testimony. *State v. Weaver*, 912 S.W.2d at 513. Moreover, immediately prior to characterizing certain evidence as "obviously a lie," the prosecutor also said "[U]nderstand, I'm not blaming these lawyers for that kind of witness or information." The prosecutor's statements were not a personal attack. They were not prejudicial. The motion court did not err in failing to find counsel ineffective for failing to object to these statements.

### 6.

Finally, appellant submits that the prosecutor made various improper inflammatory arguments to which his counsel should have objected.

### a.

Appellant claims the prosecutor appealed to the jury's fears by saying, "[I]f it were not for you, the people of the city would have no one to come to when they have been victimized." Defense counsel did not object.

Permissible prosecutorial arguments include references to the prevalence of crime in the community, the personal safety of its inhabitants, and that conviction of the defendant is part of the jury's duty to prevent crime. *State v. Debler*, 856 S.W.2d 641 (Mo. banc 1993). The prosecution may point out the possible societal effects of the general failure of juries to perform their duties. *State v. Danback*, 886 S.W.2d 204, 209 (Mo. App.1994). The prosecutor's statement in this case fell within these perimeters.

### b.

Appellant claims that the prosecutor discussed a hypothetical crime in order to inflame the jury, and that defense counsel should have taken steps to prevent this highly prejudicial hypothetical from reaching the jury's ears. The prosecutor said:

> The man (Clemons) was co-equal with Mr. Antonio Richardson who pushed them off and Mr. Gray who organized it ... If you look at the evidence, that's what it is. Let me give you an example. What would you do if you had these ... two girls and the fellow outside of a room, and he raped them, both of them, he robbed the guy, and the other guys raped them, and it's at night, and so they send the girls into the dark.
>
> MR. MOSS: Save my time.
>
> MR. CONSTANTINOU: Just a minute, Your Honor, he's mischaracterizing the evidence, it's not something that's been introduced.

THE COURT: Proceed. Overruled, proceed.

MR. MOSS: The rape is outside this room and then you send them into a dark room. Okay? All of these three—of these people in a dark room. And Mr. Antonio Richardson goes into that dark room with a knife. And Mr. Clemons goes in there with a knife, and Mr. Gray and Mr. Winfrey stand outside; and the door is closed; and it's dark, nobody can see anything

And when all is said and done, you open the door, and Tom Cummins is not dead, but he's laying there knifed. And Julie Kerry is laying there dead, with ten stab wounds in her; Robin Kerry is laying there dead with ten stab wounds in her. Okay? What do you know? Tom Cummins can't say, because it was dark, who put the ten stab wounds in Julie, who put the ten stab wounds in Robin, or who put the stab wounds in him.

But you know darn good and well the only two people who walked into that dark room with a weapon and the knives, you know, in fact, were him and the other guy. So what are you going to say? Okay? You got a bonus if you had a light bulb on, it would have made a difference. But we're going to distinguish now because we really don't know. It don't piecemeal out like that, when these fellows work together like that.

Appellant argues that this argument rendered his trial unfair because it misstated the basic tenets of accomplice liability; it was not remotely based on the evidence at trial; and was irrelevant to any issue presented at trial. While appellant correctly observes that his counsel *did* object early on in the particular argument at issue and was overruled, appellant contends that this objection was constitutionally insufficient, and that counsel should have continued to object as the prosecutor's hypothetical grew more egregious.

The prosecutor apparently used this hypothetical to illustrate the concept of accomplice liability. Appellant is correct to observe that the state's metaphor here failed to mention the necessity of the jury finding that both actors had the necessary mental state—deliberation.

∎ The fact that an argument may be improper does not necessarily mean that counsel was ineffective for not objecting. In determining ineffective assistance, courts will weigh several factors, including counsel's reason for not objecting, whether the jury was properly instructed on the law, and whether, in the total context of the trial, it was reasonably probable that the outcome would have been different absent the improper argument. *State v. Copeland,* 928 S.W.2d 828, 843 (Mo.1996).

∎ Applying these factors, we are aware that defense counsel testified at the Rule 29.15 hearing that he did not continue to object to the state's hypothetical because he was "getting tired of objecting and being overruled." Counsel's statement does not show a strategic reason for his failure to object. Thus, we must consider whether his failure to object resulted in prejudice.

In reviewing the context of the entire trial, neither the motion court nor we believe it reasonably probable that the outcome would have been different had the state's argument not been made. Ultimately, the jury received correct instructions on the law of accomplice liability. Any deficiencies in the prosecutor's argument were corrected by the trial court's instructions to the jury. *See, e.g. State v. Neal,* 849 S.W.2d 250, 255 (Mo.App. 1993). In the presence of overwhelming evidence of appellant's guilt and the propriety of the trial court's instructions to the jury on this issue, the motion court did not err in failing to find counsel ineffective on this point.

**c.**

∎ Appellant claims that the prosecutor appealed to the jurors' religious sentiments when he said, "I trust you will pray about [your decision]." He also observed that life has value, God created it, and God will take it away. Defense counsel objected to this latter statement, noting that there had been no evidence of God in the case. The Court overruled this objection. As to the first statement, it does not even begin to rise to the level of "excessive Biblical … references" against which this Court advised

in *State v. Debler,* 856 S.W.2d 641, 656 (Mo. banc 1993). Appellant offers no explanation of how he suffered prejudice from these statements. The motion court did not err in finding no ineffective assistance on issues relating to these statements.

### d.

■ Appellant asserts that his counsel was ineffective for failing to object when the prosecutor injected his personal opinion into the penalty phase argument by stating "[a]nd at this point, the truth being known, you know as well as I that the decision is death." A prosecutor may state his personal opinions on whether the death penalty should be imposed so long as that argument is fairly based on the evidence. *State v. Tokar,* 918 S.W.2d 753, 769 (Mo. banc 1996). The prosecutor's statements here is based on the evidence in the case. The motion court did not err in holding that defense counsel's failure to object did not constitute ineffective assistance

### e.

■ Appellant points to other prosecutorial arguments he considers improper in that they were inflammatory and not based on the evidence. The record reflects that defense counsel objected to these remaining arguments, and that the trial court sustained the objections. Appellant faults his counsel for not also requesting a mistrial. Where a defendant alleges ineffective assistance in his counsel's failure to ask for a mistrial, appellant must show a reasonable probability that he was deprived of the right to a fair trial. *State v. Light,* 871 S.W.2d 59, 63 (Mo.App. 1994). Such prejudice is demonstrated when it can be shown that a mistrial would have been granted by the court had it been requested. *Id.* Appellant has made no such showing in this case.

### E.

### INSTRUCTIONAL ERROR

### 1.

■ Appellant raises numerous allegations of instructional error regarding the ag-gravating circumstances presented at penalty phase.

### a.

Among the aggravating circumstances submitted to the jury were the following:

> Whether the murder of Julie Kerry was committed while the defendant was engaged in the commission of another unlawful homicide of Robin Kerry.

> Whether the murder of Julie Kerry was committed while the defendant was engaged in the attempted commission of another unlawful homicide of Thomas Cummins.

Similar aggravators were submitted regarding the murder of Robin Kerry. Appellant claims that this instructional language is faulty because (1) the language allegedly allowed the jury to impose the death penalty on appellant based upon the actions of his codefendants; (2) the first instruction does not require the jury to find that *appellant* murdered Julie Kerry while he was engaged in murdering Robin Kerry; and (3) the instruction does not require the jury even to consider *who* murdered Julie Kerry. Thus, according to appellant, the jury could find that appellant was engaged in murdering Robin Kerry while the murder of Julie Kerry was committed by someone else (i.e., Antonio Richardson or Marlin Gray).

The instruction is not erroneous. The instruction follows the language set out in MAI 313.40.2. The instructions ask whether the first murder was committed while the defendant was engaged in the commission of *another* unlawful homicide. "Another" in this context means "additional." The instruction does not allow the jury to find this aggravating circumstance against appellant based on the actions of a different defendant. The motion court did not err in holding that counsel was not ineffective in failing to object.

### b.

■ Appellant next claims that there was insufficient evidence to support the aggravator that the murders were committed while perpetrating or attempting to perpetrate a

robbery, and thus the aggravators should not have been submitted to the jury. Appellant argues there was no evidence that either he or his companions were actually carrying a deadly weapon and, absent such evidence, the jury could not find that a robbery had been committed or even attempted.

■ In Missouri, first degree robbery[6] occurs when a person forcibly steals property and in the course thereof he, or another participant in the crime, 1) causes serious physical injury to any person; or 2) is armed with a deadly weapon; or 3) uses or threatens the immediate use of a dangerous instrument against any person; or 4) displays or threatens the use of what appears to be a deadly weapon or dangerous instrument. Section 569.020, RSMo 1994. The evidence indicates that appellant told Cummins not to move or he would be shot. Appellant or one of his co-defendants also told Cummins that he had never had the pleasure of "popping" someone before. The fact that neither appellant nor any of his companions were, in fact, carrying a dangerous weapon, is immaterial. They threatened the immediate use of a dangerous weapon. This is sufficient grounds to find that a robbery was attempted or committed. *See, e.g., State v. McCracken,* 829 S.W.2d 634 (Mo.App.1992); *State v. Archer,* 814 S.W.2d 315 (Mo.App.1991). The evidence supports the aggravating circumstance that the murders were committed in the course of a robbery. The motion court did not err in holding that counsel was not ineffective for failing to object.

### c.

■ Appellant maintains that it was improper to use "duplicative" aggravators, that is, two or more aggravators which are evidenced by the same culpable conduct. For example, the jury found that the murders were committed during the perpetration of a robbery and for the purpose of receiving money or anything of monetary value. Appellant contends that this "double-counting" of aggravators misleads the jury. Similar

arguments have been presented to and rejected by this Court. *See State v. Smulls,* 935 S.W.2d 9, 23 (Mo. banc 1996); *State v. Brown,* 902 S.W.2d 278, 293 (Mo. banc 1995); *State v. Wise,* 879 S.W.2d 494, 521 (Mo. banc 1994); *State v. Ramsey,* 864 S.W.2d 320, 337 (Mo. banc 1993); *State v. Griffin,* 756 S.W.2d 475, 489 (Mo. banc 1988); *State v. Jones,* 749 S.W.2d 356, 365 (Mo. banc 1988); *State v. Walls,* 744 S.W.2d 791, 798–99 (Mo. banc 1988); *State v. Zeitvogel,* 707 S.W.2d 365, 369–70 (Mo. banc 1986). The trial court did not err in holding that counsel was not ineffective for failing to object.

### IV.

Section 565.035.3, RSMo 1994, requires this Court to determine

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found;

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant.

### A.

■ Appellant claims that the death penalty recommended by the jury and imposed by the trial court in this case was the result of the influence of passion, prejudice, or arbitrary factors, brought about by the prosecutor's alleged gross misconduct throughout the trial. We have previously considered these claims of prosecutorial misconduct and found them to be without merit. Further, there is nothing in the record to support a conclusion that the jury founded its recommendation of a sentence on passion of prejudice.

---

**6.** The state, in its brief, observes that the statutory aggravator makes reference to "any degree of ... robbery," and that second degree robbery does not require use or threatened use of a

dangerous instrument. However, the instructions actually given to the jury in this case only made reference to first degree robbery.

**B.**

■ We next consider whether the state presented sufficient evidence to support the jury's finding of the following statutory aggravating circumstances:

1) The murders of Julie and Robin Kerry were committed while appellant was engaged in the commission of another murder and an attempted murder;

2) The murders were committed while appellant was aiding or encouraging Richardson and Gray to perpetrate or attempt to perpetrate the offense of rape;

3) The murders were committed while appellant was aiding or encouraging Richardson and Gray in the perpetration or attempt to perpetrate robbery;

4) Appellant caused or directed Richardson and Gray to murder Robin Kerry;

5) Appellant murdered Robin Kerry for the purpose of receiving money or another thing of monetary value from Cummins;

6) The murders were committed for the purpose of avoiding the lawful arrest of appellant, Richardson, and Gray; and

7) The murders were outrageously or wantonly vile, horrible or inhuman in that it involved torture or depravity of mind.

The record amply supports the conclusion that the evidence supported submissions and findings on all of the aggravating circumstances submitted to the jury.

**C.**

■ In considering whether the death sentence imposed in this case is proportionate, we consider the death sentence imposed in other cases. Appellant specifically argues that his punishment is disproportionate compared to other cases in which the defendant was not the actual killer. There have been many cases in which defendant received the death sentence even where it appeared that an accomplice had done the actual killing: *State v. Skillicorn,* 944 S.W.2d 877 (Mo. banc 1997); *State v. Copeland,* 928 S.W.2d 828 (Mo. banc 1996); *State v. Gray,* 887 S.W.2d 369 (Mo. banc 1994); *State v. Shurn,* 866 S.W.2d 447 (Mo. banc 1993); *State v. Kilgore,* 771 S.W.2d 57 (Mo. banc 1989); *State v.*

*Schlup,* 724 S.W.2d 236 (Mo. banc 1987); *State v. Roberts,* 709 S.W.2d 857 (Mo. banc 1986); *State v. Gilmore,* 681 S.W.2d 934 (1984).

This case involves multiple murders. The death penalty has been found appropriate in other cases involving multiple murders: *State v. Ramsey,* 864 S.W.2d 320 (Mo. banc 1993); *State v. Mease,* 842 S.W.2d 98 (Mo. banc 1992); *State v. Hunter,* 840 S.W.2d 850 (Mo. banc 1992); *State v. Ervin,* 835 S.W.2d 905 (Mo. banc 1992); *State v. Powell,* 798 S.W.2d 709 (Mo. banc 1990); *State v. Reese,* 795 S.W.2d 69 (Mo. banc 1990); *State v. Sloan,* 756 S.W.2d 503 (Mo. banc 1988); *State v. Griffin,* 756 S.W.2d 475 (Mo. banc 1988); *State v. Murray,* 744 S.W.2d 762 (Mo. banc 1988); *State v. Young,* 701 S.W.2d 429 (Mo. banc 1985); *State v. Byrd,* 676 S.W.2d 494 (Mo. banc 1984).

These murders were committed in conjunction with rapes. There are many cases in which the death penalty was imposed for murders committed in conjunction with rapes and other crimes involving force: *State v. Kinder,* 942 S.W.2d 313 (Mo. banc 1996); *State v. Kreutzer,* 928 S.W.2d 854 (Mo. banc 1996); *State v. Nunley,* 923 S.W.2d 911 (Mo. banc 1996); *State v. Richardson,* 923 S.W.2d 301 (Mo. banc 1996); *State v. Gray,* 887 S.W.2d 369 (Mo. banc 1994); *State v. Hunter,* 840 S.W.2d 850 (Mo. banc 1992); *State v. Ervin,* 835 S.W.2d 905 (Mo. banc 1992); *State v. White,* 813 S.W.2d 862 (Mo. banc 1991); *State v. Six,* 805 S.W.2d 159 (Mo. banc 1991); *State v. Powell,* 798 S.W.2d 709 (Mo. banc 1990); *State v. Reese,* 795 S.W.2d 69 (Mo. banc 1990); *State v. Petary,* 790 S.W.2d 243 (Mo. banc 1990); *State v. Griffin,* 756 S.W.2d 475 (Mo. banc 1988); *State v. Murray,* 744 S.W.2d 762 (Mo. banc 1988); *State v. Pollard,* 735 S.W.2d 345 (Mo. banc 1987); *State v. Young,* 701 S.W.2d 429 (Mo. banc 1985); *State v. Betts,* 646 S.W.2d 94 (Mo. banc 1983); and *State v. Mercer,* 618 S.W.2d 1 (Mo. banc 1981).

This case involves murders committed in an attempt to avoid arrest for other crimes. The death penalty has been upheld in cases where the murder was committed in hopes of avoiding arrest or detection. *State v. Cope-*

234

*land,* 928 S.W.2d 828 (Mo. banc 1996); *State v. Richardson,* 923 S.W.2d 301 (Mo. banc 1996); *State v. Gray,* 887 S.W.2d 369 (Mo. banc 1994); *State v. Ramsey,* 864 S.W.2d 320 (Mo. banc 1993); *State v. Six,* 805 S.W.2d 159 (Mo. banc 1991); *State v. Kilgore,* 771 S.W.2d 57 (Mo. banc 1989); *State v. Griffin,* 756 S.W.2d 475 (Mo. banc 1988); *State v. Grubbs,* 724 S.W.2d 494 (Mo. banc 1987); *State v. Gilmore,* 661 S.W.2d 519 (1983); *State v. Foster,* 700 S.W.2d 440 (Mo. banc 1985); and *State v. Johns,* 679 S.W.2d 253 (Mo. banc 1984).

The death penalty imposed in this case is proportionate to the sentence imposed in similar cases.

## V.

We have carefully examined appellant's remaining claims and determine that they do not warrant written evaluation by this Court. We exercise our discretion not to burden the pages of the Southwestern Reporter because the points are either not properly preserved for review, are patently meritless or have been recently decided against appellant's position by an opinion of this Court. Each of these points are denied without further discussion. Rule 84.16(b).

## VI.

The judgments are affirmed.

HOLSTEIN, C.J., BENTON, PRICE, LIMBAUGH and COVINGTON, JJ., and PARRISH, Special Judge, concur.

WHITE, J., not sitting.